## ALLIANCE INS. CO. et al. v. CITY REALTY CO. (GEORGIA CASUALTY CO. et al., Interveners).

District Court, M. D. Georgia, Macon Division.
Sept. 1, 1931.

Miller & Lowrey, of Macon, Ga., for plaintiffs and also for interveners Georgia Casualty Co. and St. Paul Mercury Indemnity Co.

Brock, Sparks & Russell, of Macon, Ga. (A. O. B. Sparks, of Macon, Ga., of counsel), and Walter De Fore & Jas. C. Estes, of Macon, Ga. (James C. Estes, of Macon, Ga., of counsel), for defendant.

Smith & Smith, of Macon, Ga., for intervener Smith & Smith.

Harris, Harris & Popper, of Macon, Ga. (John Harris, of Macon, Ga., of counsel), for intervener Central Sash & Door Co.

Martin, Martin, Snow & Gillen, of Macon, Ga. (B. C. Snow, of Macon, Ga., of counsel), for interveners Macon Telegraph Pub. Co. and McClure Office Equipment Co.

DEAVER, District Judge.

The plaintiffs in this case are fire insurance companies, and defendant is a Georgia corporation having its principal office in Macon and engaged in the business of real estate, loans, and fire insurance. For many years plaintiff companies were represented by defendant as agent in Macon and adjacent territory. There was no written contract of agency between any of plaintiffs and defendant, except that each plaintiff company issued to defendant a certificate of authority substantially as follows: "——— Hereby appoints and constitutes City Realty Company of Macon, County of Bibb, State of Georgia, Agent with authority to receive proposals for insurance, countersign, issue, renew, and consent in writing to the transfer of policies of insurance, when duly authenticated, and to receive moneys on behalf of said company, in accordance with such instructions as may from time to time be given by the officers of the Company, Departmental Managers and or Field Representatives. This authority is subject to revocation at any time without previous notice."

Blank policies signed by the company were furnished to the agent by each of plaintiff companies and a policy became valid only when countersigned by the agent. The policy recited that in consideration of certain stipulations and a stated amount as premium, the company insured the person named against loss or damage by fire, not to exceed a specified sum, to described property.

The agent made a daily report showing each policy issued, amount of liability, name of assured, rate of premium, amount of premium, property covered, and the expiration date. At the close of the month, the agent made a "monthly report" showing the policies issued by number, cancellations, net premiums due, the amount of the agent's commissions, which was 20 per cent. of the net premiums, and the net amount to be remitted to the company, which was 80 per cent. of the net premiums; said amount to be remitted being known as the monthly "balance." This "balance" was to be remitted sixty days from the end of the month for which the report was made.

A policy could be surrendered by the insured at any time for cancellation, whereupon he became entitled to a refund of the unearned portion of the premium based upon the company's short rate; and a policy could be canceled by the insurance company upon five days' notice to the insured, whereupon the company retained the pro rata earned premium and returned to the insured the balance of the paid but unearned premium. The agent was authorized to make these cancellations and was required to report them to the insurance company, the resulting premium deductions being reflected in his monthly report.

When the agent issued a policy and did not collect the premium, the agent was authorized to cancel it "flat" at any time within fifteen days from the end of the month in which the policy was written, without being accountable to the company for the earned but unpaid portion of the premium; the result being that the company carried the risk without compensation from the time the policy was issued until it was canceled.

At the expiration of sixty days from the end of the month in which policies were written, the agent was required to remit to each insurance company the "balance" shown on the monthly report for the month during which the policies were written, whether or not the agent had collected the premiums. In other words, if the agent, after issuing a policy, did not cancel it within the time allowed for "flat" cancellation and did not collect the premium, but extended further credit to the insured, then the agent, regardless of whether he ever collected the premium or not, became liable to the insurance company for 80 per cent. of the premium, which 80 per cent. had been included in the "balance" reported at the end of the month in which the policy was written.

The insurance companies did not deal with the policyholders except through the agent, and did not concern themselves with the method employed by the agent in keeping books of account, collecting premiums, or depositing in bank moneys collected. They simply required the agent to remit the "balances" regardless of collections.

The well-known disposition of policyholders to accept policies offered to them in renewal of, or in lieu of, expiring policies renders valuable the expiration data or "expirations" of an agency which ceases business.

The defendant, representing several insurance companies, did not ordinarily solicit business for a particular company, but placed any policy with such company as it selected.

Defendant in operating its real estate and loan departments influenced persons dealing with them to place policies with its insurance agency. Over a long period defendant built up an insurance business with annual premiums in 1928 of approximately $30,000. Based on value of business, the "expirations" for that year were worth about $6,000.

Defendant extended credit to policyholders, who were considered as "customers" of its agency, and kept books showing accounts against such policyholders. Prior to April, 1929, it did not attempt to segregate moneys collected as premiums from moneys derived from other sources. Special agents of several insurance companies had notice that credit was extended and that insurance funds were not kept separately and as trust funds. Local insurance agents in Macon generally do business the same way. "Balances" were paid by checks of defendant on its general fund in bank.

Defendant was frequently in arrears in remitting balances and was indulged by plaintiff companies for thirty, sixty, or ninety days after the date fixed for remittance. In some instances special agents

were informed that the delay was occasioned by poor collections.

Early in 1929 defendant's financial situation became increasingly difficult, due in part to a bank failure in Macon in November, 1928, but principally to the death, in December, of its president who for many years owned most of its stock and had general control of its business. In the spring of 1929 the insurance companies became very insistent for the payment of balances and in May revoked defendant's authority as agent.

In a short time defendant was reinstated as agent in pursuance of a contract entered into by plaintiffs, defendant, and certain of defendant's creditors. The contract recited that defendant as agent. had represented plaintiffs for the purpose of selling policies for and in behalf of plaintiffs and for collecting the premiums and remitting same to the respective plaintiffs less the agent's commission, and provided, among other things, that defendant was to collect all premiums on policies issued prior to December 1, 1928, "balances" having been paid to that date, and deposit 85 per cent. of the proceeds in a special bank account to be there held until its ownership was determined by agreement or order of court, and was to collect all premiums on policies issued from December 1, 1928, to May 20, 1929, and deposit 85 per cent. of same in a special trust account to be distributed to plaintiffs; that 15 per cent. of premiums collected on policies written prior to May 20, 1929, go into defendant's general funds to be used for operating expenses, the plaintiffs, however, not thereby surrendering any part of amounts due as premiums on policies written prior to May 20, 1929; that defendant was to collect premiums for insurance written after May 20, 1929, and deposit 80 per cent. of the proceeds in a trust account and regularly distribute same to plaintiffs.

The contract became effective May 24, 1929. Within less than thirty days thereafter, defendant sold its rental department for $3,500 and borrowed $1,500, secured by a mortgage on its office furniture and the pledging of its receivables not including premium accounts. The defendant was insolvent. Having been informed that the rental department had been sold, that the loan business was unprofitable, and that the insurance department could not be profitably operated, the plaintiffs and the intervening insurance companies, in June, 1929, revoked defendant's authority as agent.

Negotiations were entered into by representatives of the insurance companies, defendant, and certain creditors of defendant, looking to the disposition of the premium accounts and the "expirations." An agreement was almost reached whereby Julius Loh was to be appointed agent, was to pay $3,000 for the "expirations," and collect the premium accounts for a commission of 10 per cent., the proceeds to be held until the rights of the parties could be determined. The prospect of litigation and fear that he would not have the full co-operation of defendant's employees, one of whom was engaged in the insurance business, caused Loh to withdraw his offer.

Thereupon the insurance companies appointed as their agent the Hatcher, Turpin Company and agreed to furnish from their home offices the "expirations" of existing policies issued through defendant. The new agent also agreed for a commission of 15 per cent. to collect the premium accounts if turned over to it by defendant.

The various interested parties not being able to agree as to their rights, plaintiffs filed this suit praying that an accounting be had, that the ownership of the accounts and expirations be decreed in plaintiffs, that defendant be enjoined from collecting or disposing of the accounts or disposing of the expirations.

Defendant in its answer admitted that it was agent to sell insurance, but denied that it was agent for the collection and remission of premiums, and alleged that its customers became indebted to it for premiums and it became indebted to plaintiffs for monthly balances, that it owned the accounts and the expirations and plaintiffs had no interest in them. Defendant had the Hatcher, Turpin Company made a party and prayed for damages and injunction against that company and plaintiffs.

Two other insurance companies intervened in the cause, taking a position similar to that of plaintiffs. Also four general creditors of defendant intervened, alleging that the premium accounts and expirations constituted a part of the assets of defendant and should be applied to payment of their claims.

The case was referred to a special master.

At the time plaintiffs revoked defendant's agency and filed this suit, defendant

had failed to remit "balances" aggregating $12,795.05. That amount was reduced by certain adjustments after suit was filed, leaving at the date of the hearing "balances" unaccounted for of $11,243.96.

On December 1, 1928, the uncollected accounts amounted to approximately $10,747.71. From December 1, 1928, to June 22, 1929, premiums on policies issued aggregated $17,334.81, of which the agent was entitled to retain as commissions $3,466.96, and was required to remit as "balances" $13,867.85.

From December 1, 1928, to June 22, 1929, defendant collected on policies written prior to December 1, 1928, the sum of $5,022.88, and on policies issued after December 1, 1928, the sum of $10,723.02, a total of $15,745.90.

In June, 1929, defendant, under court order, turned over to the Hatcher, Turpin Company as custodian accounts for premiums on policies written prior to December 1, 1928, aggregating $5,848.93 and accounts accruing after that date amounting to $6,964.53, a total of $12,813.46. The value of these accounts was fixed by the master at 40 per cent. of their face amount, or $5,125.38.

The total "balances" charged to defendant on account of policies written prior to December 1, 1928, was $9,921.67. From December 1, 1928, to June 22, 1929, defendant remitted that amount, but only $5,022.88 of that amount was collected from premiums on policies issued prior to December 1, 1928, and therefore $4,898.79 of the money applied to such balances was realized from collections on policies written after December 1, 1928, and should have been applied to the reduction of balances accruing after that date.

The premium accounts and the expirations are insufficient in value to pay the balances due by defendant.

As to the facts so far stated the evidence is not in material conflict. However, two findings of the master were made on conflicting testimony.

One was as follows: "Under a general custom and usage recognized by fire insurance companies and their local agents in their dealings, 'expirations' or expiration information relative to policies issued through the agency, is the property of the agent, provided the agent has remitted the premium 'balances,' which the agent undertook to collect and agreed to remit to the companies issuing the policies, and provided the agent has not been guilty of 'fraudulent practices.' Equally as well recognized is the usage or custom that until balances have been remitted by the agent, the insurance companies have the exclusive use and right to dispose of the 'expirations' or information relative to the expiration of policies issued by them."

The other finding was as follows: "Upon the termination of the agency, where the agent has failed to remit premium balances and has failed to collect premiums on policies so unremitted for, it is recognized and generally understood between the insurance companies and the agent, and constitutes a part of the course of dealing between such insurance companies and their agents, that the insurance companies are entitled to the accounts against their policyholders for premiums so uncollected by the agent, in order that they may be collected and their proceeds applied to the liquidation of the agent's unremitted balances, and this is true whether such balances are in arrears or whether the sixty day period for remission of balances has not expired at the termination of the agency. At the termination of an agency, the agent is required to account to his principal for all premiums on policies previously written, reserving or protecting his interest in his commissions thereon. At the time of the termination of the agency in this case, about June 22, balances for April, May and June would not in due course of business have been payable until July 1, August 1 and September 1 respectively."

Under the pleadings and the evidence in this case, the question to be determined is: What are the rights of the parties as to the premium accounts and the "expirations"?

### 1. Accounts.

An insurance policy is a contract between the company and the insured in which the insured agrees to pay the premium to the company. He may discharge his obligation by paying the premium to the agent, but his obligation is to the company. The agent agrees to collect the premium and remit the proceeds, less his commission, at the end of sixty days from the end of the month in which the policy is written. The company at its own risk gives the agent fifteen days from the end of the month in which the policy is written to collect the premium and then authorizes him, if he fails to collect in that time, to cancel the policy "flat" without any liability on his part. If the agent does not collect and does not cancel in the time allowed for flat cancellation but pre-

fers to extend further credit, the company permits him to do so but only on condition that he also become liable for the company's portion of the premium. His liability is not that of guarantor, but is an original undertaking. The company, as a matter of business policy deemed to be helpful to both itself and the agent, is willing to carry the risk from the date of the policy to the 15th of the next month, but is unwilling to carry the risk beyond that time on credit. The company does not consider it of any benefit to itself to remain liable longer under the policy on the bare promise of the insured to pay the premium. Extension of further credit might benefit the company, but it is not willing to take the risk. Unconditional extension of further credit would afford the agent an opportunity to collect the premium and thus make his commission, but, if he failed to collect it, he would be out nothing while the company would have carried the risk without compensation. Unconditional extension of further credit would therefore be for the benefit of the agent and against the interest of the company. The agent cannot thus extend the company's risk without authority from the company and, in consideration for such authority, the agent agrees, for his own benefit, to become liable to the company for its part of the premium whether collected or not. That liability is a debtor and creditor liability, but it is an additional liability to that of the insured, growing out of a separate, original undertaking on the part of the agent for a consideration, and has no effect upon the contract between the company and the insured except to prevent its termination. In extending further credit the agent acts for the company and by the company's authority. He extends the life of the contract and thus continues the company's liability to the insured on the policy and continues the liability of the insured to the company for the premium. It is the company's credit and the company's risk which are extended, and after such extension the company has the promise of the insured to pay the premium and also the promise of the agent to pay the premium less his commission. The company then depends upon the agent as agent to collect the money from the insured and remit the "balance" within the sixty-day period or, if he fails to collect as agent, then, as independent promisor, to remit the "balance" in discharge of his separate, original undertaking.

■■ If the agent, both as agent and as independent promisor, fails to remit and his agency is terminated, the company has a valid claim against both the insured and the independent promisor. The company may proceed against either or both until its claim is satisfied. If it cannot obtain the "balance" from the independent promisor, it may take charge of the account, collect it, or as much of it as is collectible, and credit the "balance" with the proceeds. The question of collecting the deficiency from the independent promisor is not material in this case, the master's report recommending that no deficiency judgment be entered for the reason that the value of the accounts and the "expirations" cannot be determined with exactness and for the further reason that the defendant is insolvent.

■ If the agent pays the "balance" as promisor, he may then later collect the premium and reimburse himself from the proceeds.

■ In this case, when the contract of May 24, 1929, was made it appeared that all balances on policies issued prior to December 1, 1928, had been remitted. If those balances had been paid by defendant as independent promisor out of its own money, then the defendant would have had the right to collect the accounts accruing prior to December 1, 1928, and retain the proceeds for its reimbursement. But those balances, to the extent of $4,898.79, were paid from collections on policies written after December 1, 1928; that is to say, with money of the insurance companies and not with money of the defendant. Therefore, no right on the part of defendant to collect those accounts and retain the proceeds ever came into existence.

Ownership of accounts by the insurance company is discussed in decided cases. See U. S. F. & G. Co. v. Sexton, 134 Ga. 56, 67 S. E. 649; Williams v. Smith Ins. Agency (Sup. Ct. Appeals, W. Va. 1915) 75 W. Va. 494, 84 S. E. 235, Ann. Cas. 1917A, 813; In re Leaksville-Spray Ins. & Realty Co., Bankrupt, decided by referee in Middle District of North Carolina; State Corp. Com. v. Guaranty Title & Trust Corp., Decided June 29, 1929 (Cir. Ct. City of Norfolk, Va.); In re Mason Company, Bankrupt (D. C.) 254 F. 164. Such ownership was also in effect recognized by the parties to this case in the contract of May 24, 1929.

Moreover, the master found that, where an agency is terminated and the agent is in arrears in the payment of balances, there exists a universal custom or recognized course of dealing under which the company

is entitled to take the accounts, collect them, and apply the proceeds to the unremitted balances. The evidence was conflicting as to the custom, but several witnesses testified to its existence and effect. The finding is amply supported by evidence and under well-recognized principles of practice should not be overturned by the court.

## 2. Expirations.

The agent in making his reports furnishes to the company expiration information identical with that retained by the agent. Such information is very valuable in connection with placing other insurance upon the same property at the expiration of existing policies. However, when an agency is terminated, the value of the expirations to the agent or to the company depends in large measure upon whether the agent has the exclusive right to use the expirations or whether the company has the right to use them through a new agent.

Many years ago it was apparently recognized generally that expirations belonged to the insurance companies. A movement was later started by agents, particularly through their associations, to have the companies make concessions and to recognize the principle that expirations belong to agents. The companies did make concessions, and by their general course of dealing with their agents have established the general rule that agents own the expirations. The companies, however, in agreeing to the general rule, included in it certain conditions in which the rule would not be operative. Under the former rule, even though an agent had paid all balances, the company could terminate the agency and then dispose of the expirations for its own benefit. On the other hand, under an unqualified rule of agency ownership of expirations, an agent in arrears could terminate the agency, refuse to pay the company its balances, and still dispose of the expirations for his own benefit. The companies at the request of agents did in effect agree to give up the right to make money out of expirations over and above their share of the proceeds of the business done by the agents, but did not agree to give up that right and at the same time to lose money on balances which the agents could not or would not pay and in consideration for which the companies had carried risks under policies. The companies by continuing the former custom or by contract could have retained the expirations as their own property, but they agreed to give the benefit of expirations, not to all agents, but to such agents as properly conducted themselves and kept their balances paid.

The constitution and by-laws of the Georgia Association of Insurance Agents recites that: "For many years the organized agents of the United States have been developing principles for the purpose of stabilizing the business of insurance. These principles form the foundation upon which the National Association of Insurance Agents and this Association have been built, and their recognition is necessary for the preservation of the American Agency System." Then follows a statement of the principles, one of which is: "(a) Agents' ownership of expirations except in case of fraudulent practices."

An excerpt from "Memorandum of Ownership of Expirations," National Association of Insurance Agents, April 12, 1927, is as follows:

"The right of an insurance agent to what is commonly known as expiration information, that is, the date concerning the renewal of an insurance policy at expiration, usually arises in either one of two cases.

"1. When an insurance agent sells his business to a purchaser and turns over to him his expiration register or other record, indicating the dates of the expiration of the business then in force.

"2. Where the relation between an agent and company terminates, either because the agent resigns the company or the company has withdrawn from an agency and appoints a successor.

"The principle involved, as stated by the National Association of Insurance Agents, is that the agent is the owner of these expirations and the information connected therewith, except in cases of fraudulent practice.

"Insofar as the principle is concerned, it is equally applicable in either of the above two cases, with the proviso always in mind that the title of the agent in the expirations is unencumbered. In order to possess a title unencumbered, the agent must have paid all balances due the company, must be free from all tainted practices in relation to his business and must not be guilty of any unprofessional or unlawful acts in connection with the change of status."

The constitution of the Macon Association of Insurance Agents pledges the support of its members to the principle of agency ownership of expirations.

Relative to the custom governing the disposition of expirations, ten witnesses testified in substance as follows: Two witnesses, that the expirations belong to the agent, but, when the company is not paid in full, then the expirations belong to the company; one witness, that the expirations belong to the agent, except that when the company is not paid it has a right to sell the expirations and apply the proceeds to the unpaid balances; one, that the agent owns the expirations unless he is not in good standing with the company; one, that the expirations belong to the agent except in the case of fraudulent practices and where the agent is not in good standing; one, that the company owns the expirations until the agent pays up in full; one, that the expirations belong to the company to the extent of the agent's liability. So much of the title passes to the company when the agent is in arrears as is needed to liquidate the indebtedness; two, that the agent owns the expirations, but the company has a prior lien thereon to the extent of its unpaid balances; and, one, that the expirations belong to the agent unless he is in arrears and so long as he obeys all rules and regulations, is faithful to his trust, and carries out all orders of the special agents and the officials of the company.

Nine other witnesses testified that, under the custom, the agent owns the expirations except in case of fraudulent practices.

Eight other witnesses testified that, under the custom, the agent owns the expirations. Of those eight, however, on cross-examination, one said that he had never known of an instance in which the agent was given the expirations without paying balances, except one in which balances were paid by the purchaser out of renewal business; another, that in purchasing an agency, he assumed the balances and the companies looked to him for payment; another, that his only knowledge of the custom was that if an agent sells out in ordinary course, he owns the expirations and can sell them, that he had had no experience with a case in which an agent in arrears claimed the right to sell the expirations, and that he had never heard of an insurance company participating as a common creditor; another, that he knew of no instance where the agency was terminated in which an agent in arrears claimed the right to sell the expirations and tell the companies to get their balances in any way they could.

The master found that, under a general custom and usage, expirations are the property of the agent, if he has remitted his balances and has not been guilty of fraudulent practices, but that until balances have been remitted the insurance companies have the exclusive right to dispose of the expirations.

■■ From a consideration of the history of the American Agency System, the statement of the rule by the National Association of Insurance Agents, and the oral testimony, it can be readily seen that the master's finding is well supported. The defendant was in arrears in remission of balances, and the insurance companies, under the custom, were entitled to dispose of the expirations. It was, therefore, not considered necessary to determine whether defendant had been guilty of fraudulent practices within the meaning of the rule.

As to expirations, see Nat. Fire Ins. Co. v. Sullard (1904) 97 App. Div. 233, 89 N. Y. S. 934; Arrant v. Ga. Casualty Co., 212 Ala. 309, 120 So. 447; Charles Rippenberger Co., bankrupt (N. Dist. Ill. Dec. 31, 1925); In re Chapman et al. (D. C. W. Dist. Ky.) 50 F.(2d) 252; Whitney v. Whitney (Ky.) 88 S. W. 311; 32 C. J. 1085; Standard Accident Ins. Co. v. McGee (Ct. of Appeals, Montgomery Co., Ohio).

The premium accounts and the expirations both together being insufficient in value to pay the balances due, there will be no excess from the proceeds to be returned to the agent.

Under the facts, the defendant is not entitled to the relief prayed for in its answer.

The exceptions to the master's report will be overruled, and the decree recommended will be entered.