**MODERN HOME INSTITUTE, INC. and Romac Resources, Inc., Plaintiffs-Appellants,**

v.

**HARTFORD ACCIDENT AND INDEMNITY COMPANY et al., Defendants-Appellees.**

**No. 371, Docket 74–1965.**

United States Court of Appeals, Second Circuit.

Argued Jan. 8, 1975.

Decided March 11, 1975.

John L. Warden, New York City (Alan M. Reinke, Sullivan & Cromwell, New York City, of counsel), for defendants-appellees Hartford Acc. and Indem. Co. and Hartford Fire Ins. Co.

Richard M. Reynolds, Hartford, Conn. (Robert M. Stephan, Hartford, Conn., Roger Skok Little, Day, Berry & Howard, Hartford, Conn., of counsel), for defendant-appellee The Aetna Cas. and Sur. Co.

George D. Brodigan, Hartford, Conn. (McNamara & Brodigan, Hartford, Conn., of counsel), for defendants-appellees The Travelers Ins. Co. and The Travelers Indem. Co.

George Levine, Hartford, Conn., for defendant-appellee The Connecticut Assn. of Independent Ins. Agents, Inc.

Before MEDINA, MANSFIELD and MULLIGAN, Circuit Judges.

MANSFIELD, Circuit Judge:

The central issue on this appeal is whether, in this treble-damage suit brought under § 1 of the Sherman Act, 15 U.S.C. § 1, charging defendants-appellees with a concerted refusal to deal with plaintiffs-appellants, the district court was warranted in granting summary judgment dismissing the complaint; more specifically whether the evidence was susceptible of inferences that would raise genuine issues as to material facts, entitling plaintiffs to a trial. We hold that upon the record the defendants were entitled to judgment as a matter of law, and affirm.

The gist of the action as set out in the amended substituted consolidated complaint[1] is that the six defendants, Hartford Accident and Indemnity Company and Hartford Fire Insurance Company (collectively referred to as "Hartford"), The Travelers Insurance Company and

·J. Daniel Sagarin, Bridgeport, Conn. (Leonard A. Schine, Joel C. Karp, Westport, Conn., of counsel), for plaintiffs-appellants.

1. This action was originally brought against 13 defendants by Romac Resources, Inc. on April 15, 1966, demanding $45,000,000 in trebled damages. Seven weeks later Modern Home Institute, Inc. filed an identical action which was soon consolidated with the Romac action. Five years later, in 1971, the amended substituted consolidated complaint was filed alleging separate conspiracies among different classes of defendants. In September 1972 plaintiffs voluntarily dismissed the action without payment as to the seven direct-writer insurance companies, see page 104 *infra*, leaving only the present defendants in the case.

The Travelers Indemnity Company (collectively referred to as "Travelers"), The Aetna Casualty and Surety Company ("Aetna") and The Connecticut Association of Independent Insurance Agents, Inc. ("CAIIA"), contracted, combined and conspired with each other to restrain insurance companies from purchasing lists of names of holders of automobile insurance policies along with the dates on which their policies expired ("X-dates") from plaintiffs, Romac Resources, Inc. and its parent, Modern Home Institute, Inc. The conspiracy allegedly took two related forms: (1) a tacit agreement between defendants and their independent insurance agents, based on a practice and/or custom in the agency insurance industry of ceding exclusively to such agents the ownership and development of the names of their respective customers and X-dates of their policies, to restrain and restrict competition in the sale and ownership of lists of names and X-dates; (2) a campaign of pressure and influence against plaintiffs' proposed business, instituted by certain defendants and state associations of independent insurance agents, which was acquiesced in by other defendants, resulting in an agreement to restrain and restrict competition in the sale and ownership of lists of names and X-dates. After eight years of voluminous discovery and pretrial motions the district court, in an opinion by Judge Blumenfeld reported at 378 F.Supp. 543 (D.Conn.1974), granted summary judgment to all defendants on the ground that plaintiffs had failed to produce any evidence, direct or circumstantial, rebutting defendants' showing that each rejection of plaintiffs' proposal was a unilateral business decision independently arrived at or that would lead a reasonable man to agree that plaintiffs' interpretation of the defendants' actions created any disputed issues of material fact as to the existence of a conspiracy. We affirm.

Whether the district court correctly determined that plaintiffs had failed to adduce evidence supporting the inference of conspiracy which they seek to have drawn requires a review of the relevant undisputed events, which follows. In 1960 plaintiff Modern Home Institute was engaged in the business of gathering by individual telephone interviews information known as "family profiles" which it sold to merchants. In late 1960 or early 1961, after its Cleveland office had at the request of Nationwide Insurance Company obtained by telephone interviews the expiration dates of automobile insurance policies owned by those interviewed, Modern Home entered the business of acquiring X-dates with a view to selling them to insurance companies for use in soliciting individuals to buy insurance. X-dates are considered by some to be a useful selling tool for automobile insurance agents, since they enable an agent to solicit insureds at the time when they are most likely to be interested in their automobile insurance coverage and when a switch of insurers is most economically feasible. Without knowing the expiration date of a prospect's current automobile insurance policy an agent may solicit him at a time when he is unwilling or unable to consider changing his insurance coverage. For this reason plaintiffs considered the acquisition and sale of lists of insureds and their X-dates to be a promising new line of business. However, the idea had never been tested on any substantial scale and no one knew whether the information would prove of sufficient use to enable plaintiffs to gather and sell it at a profit. In short, it was in the embryonic stage.

Plaintiffs began their attempt to market X-dates on a large scale in 1962. Romac Resources was organized as a wholly owned subsidiary of Modern Home to act as sales agent. Plaintiffs planned to sell their entire output of X-dates on an exclusive basis to one direct-writer insurance company and to one agency company. A direct-writer company sells insurance solely through its own salaried employee-agents who only handle insurance sold by their employer. An agency company obtains insureds

through the placement of risks with it by independent agents who usually are able to place risks with more than one insurer. The lists offered by plaintiffs were to be broken down by geographic areas. Between May and August 1962 they approached approximately 30 insurance companies, including defendant companies, but were unable to induce any to agree to purchase any significant percentage of the X-dates which plaintiffs proposed to acquire through future interviews. Romac never engaged in business after 1962.

The first defendant approached was Travelers. On April 18, 1962, Messrs. D'Arpa and Wallach, who controlled Modern Home and Romac, explained to Travelers' representatives their proposal to acquire and sell X-dates. Their proposal was later presented by the Travelers' representatives to Virgil Roby, the official having authority to decide on such a purchase. Roby testified that he rejected the proposal immediately, because it undermined the basic principle of the American Agency System; that is, that the name of each insured and the X-date of his policy are the property of the independent agent who sold the policy to the insured.[2] On May 18, 1962, Travelers wrote D'Arpa that it would not purchase lists of X-dates because of Travelers' commitment to the American Agency System. Travelers, however, suggested that the X-dates might be offered to its independent agents for sale directly to them, a suggestion that was not pursued by plaintiffs.

There is no evidence that in arriving at its decision Travelers communicated directly or indirectly with any other alleged co-conspirator or insurance agent. Indeed, the only evidence is that there was no such communication. No other defendant had rejected or reached a decision to reject plaintiffs' proposal (in-

deed, most had not yet been approached) and there is no evidence that Travelers even knew that any other defendant had been approached.

Meanwhile, beginning in May 1962, D'Arpa also approached the Hartford companies, meeting on May 8 with Channing Barlow and several other Hartford officials. Although initially interested, Barlow and his colleagues soon expressed concern over numerous problems, including the quality of plaintiffs' product, whether certain depressed areas could be eliminated, whether plaintiffs could develop a viable organization, and plaintiffs' inability to supply the names of policy issuers. Hartford did not want to pay for lists of its own policyholders or have its agents soliciting them. To avoid the latter possibility it would be necessary, if Hartford bought the names, to weed out the names of Hartford insureds from the lists, which would involve much work and expense. Furthermore, unless it knew the name of each policyholder's existing agent (which plaintiffs also could not supply) Hartford might supply one of its agents with information about the clients of another of its agents, which it clearly wanted to avoid. Because of this last problem one of Barlow's colleagues, Mr. Gilmore, immediately advised against accepting the proposal. The cost of the names was also seen as a **problem** by Hartford. The names were to cost 30 cents each on a test basis and 45 cents each thereafter. Hartford had previously been paying another company two cents each for names and addresses broken down by geographic area.

According to Hartford's officials a further problem was seen in the possibility of a direct-writer insurance company buying plaintiffs' product and thereby gaining a significant competitive advantage. Such companies would not have

---

2. It is the custom and practice of the agency companies to include in their contracts with independent agents a clause which expressly gives the agent upon termination of the agency agreement exclusive possession of all policyholders' records and policy expiration dates and prohibits the company from communicat-

ing this information to other agents or using it iself for solicitation of business. This is conditioned upon the agent having accounted for and paid all premiums due the company and not otherwise being financially indebted to the company.

the agency relations problem and could best utilize lists of names and X-dates. Hartford asserts, and plaintiffs dispute, that for this reason it was decided that Hartford agents should be alerted to the substance of the plaintiffs' proposal whether or not it was accepted.

The decision to reject the proposal and to send a bulletin to all Hartford agents was made at a staff meeting on May 21, 1962. On May 31 Barlow wrote Romac, informing it of Hartford's decision. In reaching this decision Hartford did not communicate with any competitors and was unaware of any action taken by any other insurance company with respect to plaintiffs' proposal. Shortly thereafter the final draft of the letter to Hartford agents was approved and directed to be mailed by June 6.[3]

On May 8, the date of his initial contact with Hartford, Mr. D'Arpa presented to Mr. Ellis of Aetna the proposal for sale of X-dates to it. Ellis bought a list of 100 names and X-dates for a trial test in New Jersey. The list was received in Aetna's Newark, New Jersey, office on May 12 at which time the test commenced. During the next two months while the New Jersey test was being conducted D'Arpa and Wallach had intermittent communications with Ellis, discussing among other things the reaction of agents to the Hartford letter of June 6 and Aetna's desire to eliminate geographical areas where it could not use the X-dates.

The preliminary report on the New Jersey test was submitted on July 9. It demonstrated that only certain young, specially-trained agents, of which Aetna had about 500, would effectively utilize the X-dates. Other, less aggressive, agents apparently did not follow up the leads supplied by the X-dates sufficiently to warrant their cost. A large majority of the agents who participated in the test indicated that they thought that a price of 40 cents each was too high and would not be willing to pay for them at that price.

On July 10, 1962, Ellis and another officer of Aetna, VanGils, met with D'Arpa and Wallach at plaintiffs' offices in Pelham, New York, to inspect plaintiffs' facilities and learn the exact terms on which plaintiffs were offering their product. Problems were discussed (including the problem of checking plaintiffs' lists with Aetna's records to avoid giving one Aetna agent the X-dates of another) and the exclusion of Massachusetts, where Aetna cannot sell its leading policy, was requested. At this meeting the Aetna officials learned for the first time that plaintiffs were expecting to produce about 9 million names per year, all of which Aetna would have been required to take on a national basis, including 17 states in which Aetna could not have made any use of the dates. At the price of 45 cents each, the cost would have been over $4 million per year. Concerned with Aetna's inability to utilize such a large number of X-dates effectively, Ellis suggested to plaintiffs that they sell directly to agents or agents' associations and offered to help plaintiffs market their product directly to Aetna's agents.

Both Ellis and VanGils came away from the Pelham meeting with the impression that Aetna would have had to

---

3. The June 6, 1962, letter:

"Just recently the proposal was made to us that The Hartford Insurance Group purchase from a national research service the names of automobile insurance policyholders along with the expiration dates of their policies. The Hartford is, however, unwilling to be in the position of furnishing to one independent agent the names and expiration dates of another agent's policyholders.

"Nonetheless, we feel that we should advise you that this information has been offered for sale to us and to other insurance companies. Obviously, the impact of this is that your competition may in the future be working with an actual expiration list of your automobile policyholders, contacting them at just the right time.

"As always, the best defense against this development is prompt, personal solicitation of renewals offering counsel and protection of high quality."

take all 9 million names per year or none at all. Plaintiffs contend that these problems could have been resolved by further negotiations but do not dispute the accuracy of Ellis' and VanGils' recollection. Based on this impression Ellis and VanGils mutually agreed on the trip home from Pelham that Aetna should reject plaintiffs' proposal. In reaching this decision they considered the necessity of buying the names on a national basis, the high cost, the additional expense of having to check the lists in order to eliminate those already insured by Aetna, the unlikelihood that agents would share the cost and the failure of agents to follow up leads obtained in other similar programs. Aetna did not base its decision on the view that its acquisition of the X-dates would violate the American Agency System's principles or the terms of contracts between insurers and their agents, which it construed as applying only to an agent's own personal records of his policyholders and their expiration dates and not to information that might be acquired by plaintiffs from the policyholders.

The rejection decision was announced at a weekly Aetna staff meeting on July 16, 1962. On July 17 Ellis sent D'Arpa a letter informing him of the decision. Before rejecting the offer Aetna did not communicate with any other insurer regarding this offer. This is no evidence that agents coerced or put pressure on Aetna to reject the proposal. On the contrary, although it was aware of agent opposition to the plan, it issued a memorandum on July 27, 1962 to its managers to the effect that its agency agreements did not preclude its buying X-dates from plaintiffs and that it was currently testing dates purchased from plaintiffs.

The fourth defendant, the CAIIA, became involved as a result of the June 6th Hartford letter which provoked a heavy response from Hartford agents, particularly those having strong views regarding their exclusive rights to the X-dates of their clients. Some congratulated Hartford on refusing to help distribute X-dates, expressing concern that the X-dates must have been gathered in an illegal fashion and requesting more specific information. Allegedly because of the volume of response and the similar nature of the inquiries Barlow of Hartford sent a memorandum, dated June 14, 1962,[4] to Business Development Representatives explaining Hartford's rejection and plaintiffs' method of gathering X-dates and another letter to Hartford agents, dated June 18, 1962,[5] again explaining plaintiffs' business methods. Other letters were sent by Travelers to Travelers managers, dated June 25, 1962,[6] explaining that Travelers

4. The June 14, 1962, letter:

"Since my earlier letter on this topic . . ., one question has arisen which needs clarification.

"We have been asked several times where the research service gets the information which it is offering for sale. The answer is that the researchers are gleaning this information from telephone and personal interviews which ask questions on a variety of topics, automobile insurance being only one.

"The Hartford's purpose in advising agents of this development was two-fold: (1) to forewarn our agents of a possible competitive threat and (2) to explain the Hartford's stand against offering this type of information.

"Perhaps the above information will enable you to answer any questions which may arise in your areas."

5. The June 18, 1962, letter:

"Our earlier letter of June 6 reported to you that The Hartford had refused to purchase from a private research service the names of automobile policyholders along with the expiration dates of their policies.

"Since that time many agents have asked us how research services could get the type of information which is offered for sale. We are informed that researchers glean this information from telephone and personal interviews with car owners which ask questions on a variety of topics, automobile insurance being only one. It should be emphasized that, to the best of our knowledge, no state or governmental unit, insurance company or insurance agency is providing any of the data."

6. The June 25, 1962, letter stated in substance:

"We have reproduced on the reverse a letter sent by a Hartford insurance compa-

would not purchase X-dates because of its belief that they are the property of the agent and by Travelers to its agents, on July 5, 1962,[7] explaining that Travelers had rejected a proposal to buy X-dates. The reason given by Travelers for sending its letters were substantially the same as those given by Hartford.

As part of this reaction, Mr. Crosson, then president of CAIIA, was sent a copy of the June 6 letter by a Hartford agent. On or after June 13, 1962, he telephoned Hartford once or twice concerning the sale of X-dates and requested that he be sent copies of the letters. His next communication with any of the defendants came on July 19, 1962, after Aetna had declined plaintiffs' proposal, when he attended a luncheon meeting at the Aetna home office in his capacity as president of CAIIA. The Romac proposal, among other things, was discussed at that meeting.

Finally, CAIIA released an information bulletin on July 19, 1962, containing an article that was critical of plaintiffs' attempt to sell X-dates.[8] This was one of many articles appearing in the trade press at that time expressing strong op-

position to the sale of X-dates, most of which followed Hartford's June 6 letter.

In the end plaintiffs failed to sell their program to any of some 30 insurance companies, including several direct-writers of insurance (e. g., Nationwide, Liberty Mutual, State Farm, Allstate), which had over 20% of the automobile insurance market and would not have been susceptible to pressure of insurance agents, since they sell insurance through their own employees, not through agents. No evidence was offered to show that the defendants were connected with the decisions of other insurers.

### DISCUSSION

■■■ Section 1 of the Sherman Act, which proscribes every "contract, combination, or conspiracy" in restraint of trade, is directed only at joint action. Ford Motor Co. v. Webster's Auto Sales, Inc., 361 F.2d 874, 878 (1st Cir. 1966). It does not prohibit independent business actions and decisions. A person still has the right to refuse to do business with another, provided he acts independently and not pursuant to an unlawful understanding, tacit or expressed. Fundamen-

ny [the June 6, 1962, letter of Hartford] to its agents countrywide. You will be interested in knowing that this expiration list service was offered to and rejected by The Travelers.

"We are aware of only one nationwide insurance company presently subscribing to this service, but it can reasonably be expected that additional segments of the industry will elect to use this prospecting medium in the future. Thus we should alert our producers to this development, and emphasize to them the new peril which threatens the security they have in their ownership of expirations."

7. The July 5, 1962, letter:

"It's true! Only recently the Travelers was offered expiration lists on automobile policies compiled by telephone and personal interviews. These lists will be complete enough to catalogue the expiration date of every automobile policy in your county, city, or neighborhood. Of course we rejected the proposal—we will have no part in tampering with your ownership of renewals. You truly own your renewals because of two things—

"1. Your Travelers contract says so, a basic tenet of the American Agency Sys-

tem, to which we wholeheartedly subscribe, says so, and

"2. Your customer will *want* to renew his automobile insurance with you if he is satisfied that you are providing him with the best protection in the best insurance company which represents true value.

"It is reasonable to assume that some segments of the insurance industry will subscribe to this service. Then your competition presumably will be able to solicit your renewals at the optimum time.

"We believe that the Travelers automobile policy from the *Travelers Agent* is most likely to renew."

8. The article recounted Hartford's rejection, stated CAIIA's opposition to the sale of X-dates, reported the opinion of the Connecticut Insurance Department (solicited by CAIIA) that the solicitation of X-date information was illegal in Connecticut if not done by a licensed Connecticut insurance agent and recommended that members report to CAIIA any attempts to solicit X-date information from their clients.

tal then to any § 1 claim is the finding of an agreement, express or otherwise, between two or more persons. While normally only those agreements which impose an unreasonable restraint upon interstate commerce are condemned, Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), certain agreements, including concerted refusals to deal and group boycotts of the type alleged here, have long been held to be *per se* unreasonable and always illegal, e. g., Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); United States v. General Motors, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); Klor's v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); Fashion Originator's Guild of America, Inc. v. Federal Trade Commission, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941); Eastern States Retail Lumber Dealers Assn. v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914). Upon this appeal from a summary judgment dismissing this Sherman Act complaint the only issue is whether there existed a question of material fact with regard to the existence of the alleged concerted refusal to deal.

Plaintiffs argue that since the decision in a complex § 1 Sherman Act suit turns upon inferences as to the motive, intent, and purpose of the alleged co-conspirators, which must be drawn from a mass of circumstantial evidence, and since the proof is largely within the control of the alleged co-conspirators themselves, summary judgment is inappropriate. It is undoubtedly true that the remedy of summary judgment should be used sparingly in an antitrust suit, at least where the action is based on complicated and extensive evidence, see Norfolk Monument v. Woodlawn, 394 U.S. 700, 704, 89 S.Ct. 1391, 22 L.Ed.2d 658 (1969) (*per curiam*); Poller v. Columbia Broadcasting, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), since it is a rare case where the evidence available to both sides is fully explored before trial and where the alleged co-conspirators can establish that the evidence is not susceptible of the inferences urged by the plaintiff. However, in First National Bank v. Cities Service Co., 391 U.S. 253, 289, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968), the Supreme Court held that once defendants have shown "that the facts upon which [plaintiffs] relied to support [their] allegation were not susceptible of the interpretation which [they] sought to give them" plaintiffs are obligated by Rule 56(e), F.R.Civ.P.,[9] to offer evidence supporting the inferences urged by them or else face summary judgment dismissing their complaint.[10]

Here summary judgment cannot be denied because of incompleteness or inconclusiveness of the factual record or because of substantial issues as to credi-

**9.** Rule 56(e) provides in pertinent part:
"When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

**10.** Although our research indicates that this Circuit has not, since its decision in *Cities Service* was affirmed by the Supreme Court, had occasion to issue an opinion discussing summary judgment for a defendant on the conspiracy issue, other Circuits have been more active in the area. Their decisions have firmly established that, under *Cities Service,* a § 1 action can be dismissed if the plaintiffs fail to meet defendants' proof on summary judgment. E. g., Scranton Construction Co., Inc. v. Litton Industries Leasing Corp., 494 F.2d 778 (5th Cir. 1974), cert. denied, 419 U.S. 1105, 95 S.Ct. 774, 42 L.Ed.2d 800 (1975); Bushie v. Stenocord Corp., 460 F.2d 116 (9th Cir. 1972); Dahl, Inc. v. Roy Cooper Co., 448 F.2d 17 (9th Cir. 1971); Tripoli Co. v. Wella Corp., 425 F.2d 932 (3d Cir.), cert. denied, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970); Daily Press, Inc. v. United Press Int'l, 412 F.2d 126 (6th Cir.), cert. denied, 396 U.S. 990, 90 S.Ct. 480, 24 L.Ed.2d 453 (1969); .McGuire v. Columbia Broadcasting System, Inc., 399 F.2d 902 (9th Cir. 1968). See also Pacific Tobacco Corp. v. American Tobacco Co., 1974 Trade Cas. ¶ 74,991 (D.Ore., Feb. 7, 1974).

bility, which were factors that influenced the closely-divided Supreme Court against allowing the summary judgment to stand in Poller v. Columbia Broadcasting, *supra,* 368 U.S. at 472–73, 82 S.Ct. 486. This case has been pending for over eight years. It was begun in 1966 and pretrial discovery continued until 1973, when the summary judgment motions were made. During that time over 5,000 pages of depositions were taken from all witnesses who could furnish any significant relevant testimony. The available documentary evidence has also been exhausted. Numerous affidavits and exhibits were filed, a substantial number of interrogatories were answered, defendants produced relevant documents and even the Justice Department pursued an investigation. Hence plaintiffs have had over seven years to obtain whatever proof of a conspiracy there may be in the hands of defendants. They have confronted every person employed by defendants who had occasion to pass judgment upon plaintiffs' proposal and to question his motives and intentions. Moreover, they have had ample opportunity, of which they have availed themselves, to examine defendants' files and records to search for any documents relating to the rejection of their proposals.

■■ Under these circumstances, unless plaintiffs have thus far turned up evidence from the defendants or elsewhere supporting their conspiracy theory we do not see how, in the face of defendants' uncontradicted evidence negating it, trial would give them any greater opportunity to elicit from defendants and their employees evidence tending to prove it. Cf. Tripoli Co. v. Wella Corp., 425 F.2d 932 (3d Cir.), cert. denied, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970) (summary judgment for defendant after extensive discovery affirmed); Daily Press, Inc. v. United Press Int'l, 412 F.2d 126 (6th Cir.), cert. denied, 396 U.S. 990, 90 S.Ct. 480, 24 L.Ed.2d 453 (1969) (summary judgment for defendant after extensive discovery affirmed). If

the most that can be hoped for is the discrediting of defendants' denials at trial, no question of material fact is presented. See First National Bank v. Cities Service Co., *supra*; Dyer v. Mac-Dougall, 201 F.2d 265, 268–69 (2d Cir. 1952). Even if we were to disregard the denials as incredible, plaintiffs would still be required to come forward with evidence which, viewed most favorably to them, would permit an inference of conspiracy. Absent such evidence, there is no issue for trial. "Summary judgment cannot be defeated by the vague hope that something may turn up at trial," Perma Research and Development Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969).

■ Both sides agree that parallel behavior alone is not sufficient evidence of conspiracy to find a Sherman Act § 1 violation. Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 541, 74 S.Ct. 257, 98 L.Ed. 273 (1954); Kreager v. General Electric Co., 497 F.2d 468 (2d Cir. 1974), cert. denied, 419 U.S. 861, 95 S.Ct. 111, 42 L.Ed.2d 95 (1974); Delaware Valley Marine Supply Co. v. American Tobacco Co., 297 F.2d 199 (3d Cir. 1961), cert. denied, 369 U.S. 839, 82 S.Ct. 867, 7 L.Ed.2d 843 (1962). The mere fact that all defendant companies were initially enthusiastic about plaintiffs' proposal and then rejected it, even if they knew the other defendant companies were doing likewise, is not enough to defeat the motion for summary judgment. E. g., Dahl, Inc. v. Roy Cooper Co., 448 F.2d 17 (9th Cir. 1971). Such parallel conduct is consistent with independent competitive decisions or at most reflects a non-consensual decision not to compete. Additional facts or circumstances are needed to show that the decisions were interdependent and thus raise the inference of a tacit agreement to boycott. Independent Iron Works, Inc. v. United States Steel Corp., 322 F.2d 656 (9th Cir.), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963); Turner, The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals

to Deal, 75 Harv.L.Rev. 655, 658–59, 681 (1962).

Plaintiffs argue that the additional circumstances necessary to infer interdependence may be found by examining the defendants' interests in accepting or rejecting their proposal. First, plaintiffs contend that it was in the individual economic self-interest of every defendant company to accept their proposal and to buy the X-dates because of the great competitive advantage they would bestow upon the buyer. Actions against the apparent individual economic self-interest of the alleged conspirators may raise an inference of interdependent action. See, e. g., First National Bank v. Cities Service Co., *supra*, 391 U.S. at 279–80, 88 S.Ct. 1575; Winchester Theatre Co. v. Paramount Film Distributing Corp., 324 F.2d 652 (1st Cir. 1963); Delaware Valley Marine Supply Co. v. American Tobacco Co., *supra.* Concurrently, they contend that because of the competitive advantage which the program would give one company over the others, it would be in the individual self-interest of each company to reject the program only if all the others did so too. Such actions, only in one's self-interest if done in concert with others, may also provide the basis for an inference of illegal conspiracy. E. g., Interstate Circuit, Inc. v. United States, 306 U.S. 208, 225, 59 S.Ct. 467, 83 L.Ed. 610 (1939); cf. Milgram v. Loew's, Inc., 192 F.2d 579 (3d Cir. 1951), cert. denied, 343 U.S. 929, 72 S.Ct. 762, 96 L.Ed. 1339 (1952).

Mindful of the foregoing principles and of the requirement that all inferences of fact be drawn in favor of the party opposing summary judgment, see United States v. Diebold, Inc., 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (*per curiam*); Empire Electronics Co. v. United States, 311 F.2d 175 (2d Cir. 1962), we turn to the evidence relied upon by plaintiffs as supportive of a finding of conspiracy and to defendants' evidence against it. Plaintiffs rely upon proof (accepted by us as credible for present purposes) that the X-dates would be useful to age :s in soliciting business,

that each defendant company expressed initial interest in plaintiffs' program, and that each company thereafter turned down the proposal. From this plaintiffs seek to infer a mutually interdependent boycott. However, in support of its motion for summary judgment each company has come forward with uncontradicted evidence that it rejected plaintiffs' proposal for independent business reasons which are spelled out in detail. Plaintiffs should have responded with an offer of evidence that would raise material factual issues with respect to this evidence, but they have not controverted any of the facts relied upon by the movants and for the most part have not offered any explanations or arguments that would reconcile the undisputed facts with the existence of the alleged conspiracy. For instance, plaintiffs do not seriously dispute the fact that their inability to provide selective lists, from which the names and X-dates of the policyholders of each defendant's agents would be eliminated, presented genuine problems to the defendants, which led some of them to reject the proposal. For obvious reasons neither Aetna nor Hartford wanted to pay for information already in its agents' possession or to give one of its agents the name of another of its agent's clients. Aetna certainly did not want to buy names for states where it could not use them. Nor did it or Hartford want to incur the expense of weeding out information that it would not wish to turn over to its agents.

Plaintiffs offer no answer to proof that the proposed price of 45 cents per name was considerably higher than that charged to Aetna by others offering similar though less comprehensive services. The outlay of over $4,000,000 for some 9,000,000 names would far exceed Aetna's usual promotional budget. Aetna could not expect its agents to share the cost of purchasing the information, and its New Jersey test had revealed the names to be of only limited utility. None of these facts is disputed.

Plaintiffs seek only to controvert one of the reasons advanced by the de-

fendants for their rejection of plaintiffs' proposal and then only by argument as to the inferences that might be drawn. That reason (which was the sole reason in the case of Travelers) was each defendant's concern for good relations with its independent agents. As an agency company each defendant relied entirely upon these agents, who were not employees under its control, to obtain and retain its business. An independent agent, having successfully solicited and procured each of his insureds, naturally considers his list of clients and their X-dates to be his own property. He resents and views with suspicion any dealing in this property by others as a threat to his own livelihood. Should an agency company start trafficking in such information it is obvious that its agents might well switch their clients from that company to one that would not engage in such activity.

Plaintiffs argue nevertheless that each defendants' apprehension over this possibility must be viewed as evidence of conspiracy since it demonstrates that each was subject to pressure from its agents. We disagree. A company's concern over the possible alienation of its agents is a legitimate basis for independent protective action on its part, which cannot be viewed as conspiratorial in the absence of some evidence of tacit understanding with competitors. Mere pressure by the agents themselves would not provide a basis for such an inference.

Apparently recognizing that something more must be shown in response to the overwhelming undisputed evidence that each defendant company acted unilaterally and independently plaintiffs point to Hartford's letters of June 6, 14 and 18 and Travelers' letters of June 25 and July 5 to their respective agents and managers as supplying the deficiency. They argue that these letters may be viewed as having been intended to instigate the agents to put pressure upon other agency companies collectively to maintain the competitive status quo. Since, following the letters, some agents and others did voice their well-known views, and agency companies that turned down plaintiffs' proposal might well have been apprehensive that one or more competitors might accept it and gain a competitive advantage, the contention that the letters were part of a scheme to adopt coercively interdependent collective action would be persuasive if there were some evidence to support it. But the record reveals none. The letters themselves contain no suggestion of incitement or mutual action. On the contrary, they support defendants' position that they were intended simply to inform the company's agents of its decision and alert them to the prospect of competitive use of the information by others. At most the letters could be characterized as ambiguous.

More important, there is no evidence that any competitor was induced by the letters to refrain from purchasing plaintiffs' program. Hartford and Travelers had rejected the program well before their respective letters were sent and there is no evidence that the letters were suggested or instigated by agents or competitors. On the contrary, Aetna offered to recommend plaintiffs' program to agents placing business with it for purchase by them—hardly the conduct of someone jointly participating in a plan to boycott the proposal. Furthermore, when news came to Aetna that agents, having heard of Hartford's decision, had vigorously objected to plaintiffs' proposed program, Aetna passed the information along to Romac,[11] which was

11. An interoffice memorandum sent by Mr. Ellis to certain other Aetna managers on June 27, 1962, stated:

"Many of you have seen the bulletin of the Hartford Fire Group to their agents stating that they have been approached by a national research service offering them the opportunity to purchase automobile 'X' dates gathered during the process of household interviewing. This bulletin states they have rejected this offer because 'the Hartford is however unwilling to be in a position to furnish to one independent agent the names and expiration dates of another agent's policyholder'.

"This bulletin has created quite a furor in the industry as evidenced by a bulletin on this subject in the Empire State Agency

hardly consistent with participation in a conspiracy directed against Romac. Furthermore, Aetna's past willingness to embark on programs contrary to the wishes of agents placing business with Aetna was a matter of record.[12] Lastly, it is not disputed that agency pressure could not induce direct-writers of insurance to refrain from purchasing plaintiffs' plan, since they were not dependent upon agents for their business which amounted to approximately 21% of the market, or twice the combined share of Aetna, Hartford and Travelers. Yet no direct-writer purchased the program.

The overwhelming insufficiency of plaintiffs' evidence of implied or tacit understanding can best be understood when compared with the evidence in cases where such conspiracies have been found to exist. Foremost among these is United States v. Parke, Davis & Co., *supra,* where a manufacturer created an illegal combination to maintain the retail prices of its products by using the wholesalers to induce the retailers' cooperation. The evidence of coercive interdependence was supplied by the manufacturer's actions:

> "In order to insure that retailers who did not comply would be cut off from sources of supply, representatives of Parke Davis visited the wholesalers and told them, in effect, that not only would Parke Davis refuse to sell to wholesalers who did not adhere to the policy announced in its catalogue, but also that it would refuse to sell to wholesalers who sold Parke Davis products to retailers who did not observe the suggested minimum retail prices. Each wholesaler was interviewed individually but each was informed that his competitors were also being apprised of this. The wholesalers without exception indicated a willingness to go along.
>
> "Representatives called contemporaneously upon the retailers involved, individually, and told each that if he did not observe the suggested minimum retail prices, Parke Davis would refuse to deal with him, and that furthermore he would be unable to purchase any Parke Davis products from the wholesalers. Each of the retailers was also told that his competitors were being similarly informed." *Id.* 362 U.S. at 33–34, 80 S.Ct. at 507.

The manufacturer enforced the program by cutting off non-complying retailers, supplying to wholesalers the names of non-complying retailers to be cut off and attempting to convince price cutting retailers to charge the set prices on the assurance that their competitors would do the same.

In the more recent case of Albrecht v. Herald Co., *supra,* the evidence of coerced interdependence was of an equal

Forum, which is the voice of the New York State Association of Insurance Agents. Many of you, of course, have seen the news item on this subject in the June 21st copy of the Journal of Commerce."

This memorandum was sent by Ellis to D'Arpa of Romac on June 29, 1962, under a cover letter which characterized the "furor in the industry" as a problem.

12. Mr. Ellis testified in his deposition to several previous instances in which Aetna acted in face of strong agent opposition when it felt that the proper course was being taken. These included the opening of branch offices, the creation of office agents and the introduction of Auto-Rite, Aetna's leading automobile insurance policy.

Aetna's disagreement with the views of the agents and some of the other agency companies on the sale of X-dates in this case is best expressed in another portion of the June 27, 1962 memorandum of Ellis:

"[W]e think we would be less than intelligent, and less than fair to our agents if we were to take a position which would deny to our producers the prospecting tools which are so readily available to the direct-writer. One is almost forced to the conclusion that some companies and many independent agents are busy locking interior doors against each other—all the while leaving the big front door wide open to directwriter salesmen who are not in the least bashful about obtaining the independent agent's 'X' dates by any means available. We know of nothing in the American Agency System or in the free enterprise system which would indicate in any way that one agent or one company should refrain from obtaining the business of another, as long as they act honorably and ethically."

caliber. The respondent newspaper publisher attempted to induce one of its independent carriers to charge no more than its set maximum price:

"[R]espondent hired Milne Circulation Sales, Inc., which solicited readers for newspapers, to engage in telephone and house-to-house solicitation of all residents on Route 99. As a result, about 300 of petitioner's 1,200 customers switched to direct delivery by respondent. Meanwhile, respondent continued to sell papers to petitioner but warned him that should he continue to overcharge, respondent would not have to do business with him. Since respondent did not itself want to engage in home delivery, it advertised a new route of 314 customers as available without cost. Another carrier, George Kroner, took over the route knowing that respondent would not tolerate overcharging and understanding that he might have to return the route if petitioner discontinued his pricing practice. On July 27 respondent told petitioner that it was not interested in being in the carrier business and that petitioner could have his customers back as long as he charged the suggested price." *Id.* 390 U.S. at 147–48, 88 S.Ct. at 870 (footnote omitted).

The Court held that this evidence clearly proved an unlawful combination of the newspaper publisher, Milne and Kroner to force petitioner to conform to the set maximum retail price.

In the face of the uncontradicted evidence that each defendant's rejection of plaintiffs' proposal was unilateral and independent, the Hartford and Travelers letters fail to raise a material factual issue with respect to the existence of the alleged conspiracy. Plaintiffs have not proffered any probative evidence or facts tending to support their belated theory of mutual coercive interdependent action, such as evidence of the type recognized in *Parke, Davis, Albrecht* and similar cases. The defendants' evidence of the motives and reasons for their action stands uncontradicted. The district court's order granting summary judgment is affirmed. First National Bank v. Cities Service Co., *supra,* 391 U.S. at 289, 88 S.Ct. 1575.