BRUNETTI, Circuit Judge:
Daniels-Head and Associates (“Daniels-Head”) appeals a district court judgment affirming a bankruptcy court’s decision in favor of appellees. Daniels-Head contends appellee. Marsh & McLennan, Inc. was unjustly enriched as a result of obtaining administrative records in which Daniels-Head had a property interest. Appellant also contends that Marsh & McLennan intentionally interfered in appellant’s contractual relationship with the American Op-tometric Association (“AOA”). We disagree and affirm.
I
BACKGROUND
Daniels-Head, an Ohio corporation doing business in Nevada, entered into an agreement in 1954 with the AOA to act as insurance broker for and administrator of certain AOA group insurance plans. Initially, Continental Casualty Company of Chicago (“Continental”) was the insurance carrier for the AOA.
In 1976, Daniels-Head transferred the AOA’s group health insurance program from Continental to the New York Life Insurance Company (“N.Y. Life”) and entered into a brokerage commission agreement with N.Y. Life. Daniels-Head received a fifteen percent commission on the premium values of all the policies sold during the first year of the agreement and a five percent commission on all renewals. Daniels-Head entered into a second contract with N.Y. Life to provide administrative services under the policies issued by N.Y. Life to the AOA. Pursuant to this agreement, Daniels-Head collected the premiums from AOA for N.Y. Life. The agreement required the appellant to deposit the premiums collected in a separate trust account.
In December 1979, Daniels-Head failed to remit to N.Y. Life between $900,000 and $1,200,000 in premiums it had collected from the AOA. On February 5, 1980, representatives of Daniels-Head, the AOA, and N.Y. Life met to resolve Daniels-Head’s delinquent remittance problem. The parties entered into a “depository agreement” which expressly required Daniels-Head to deposit in a separate trust *916 account the premiums collected from the AOA.
In January 1980, William Head, Chairman of the Board of Daniels-Head, entered into negotiations with Calvin Wessman, Director of appellee William M. Mercer, Inc. (“Mercer”), a subsidiary of appellee Marsh & McLennan, for the sale and purchase of Daniels-Head. On January 9, 1980, Mr. Wessman requested certain information from Mr. Head to evaluate the purchase of Daniels-Head. In a letter to Mr. Head, Mr. Wessman stated that the material received from Mr. Head would be “held in the strictest of confidence but in no way can our receipt of [the information] preclude [the company] from the ordinary pursuit of our business now or in the future.” The letter also stated that Mercer and Marsh & McLennan would not “intentionally use any such materials to gain an advantage.”
On February 15, 1980, N.Y. Life terminated its service agreement with Daniels-Head because Daniels-Head had failed to remit the premium due on the AOA major medical plan and because Daniels-Head failed to deposit premium contributions into a separate trust account. On March 12, 1980, N.Y. Life terminated Daniels-Head's broker’s contract. Later that month, Mr. Wessman informed Mr. Head that Marsh & McLennan was no longer interested in purchasing Daniels-Head.
On June 19,1980, appellee Smith-Sternau Organization, Inc. (“Smith-Sternau”), a subsidiary of appellee Mercer, along with several other companies, submitted a proposal to the AOA to become the broker for and administrator of certain group insurance plans offered to members of the AOA. N.Y. Life and Marsh & McLennan entered into a service agreement which provided that Marsh & McLennan would act as administrator of the insurance policies sold by N.Y. Life to the AOA. As a result of the agreement, Marsh & McLennan received from N.Y. Life the administrative records concerning the group insurance policies that N.Y. Life had sold to the AOA. These records were previously in the custody of Daniels-Head. N.Y. Life had obtained copies of the records on March 7, 1980, pursuant to a preliminary injunction granted by the United States District Court for the Southern District of Ohio.
On February 22,1980, Daniels-Head filed a complaint against N.Y. Life in Ohio state court contending, inter alia, that N.Y. Life’s termination of its service agreement with Daniels-Head was a breach of contract. The action was removed to United States district court in Ohio, and N.Y. Life filed a counterclaim against Daniels-Head on March 5, 1980.
On March 9, 1981, Daniels-Head filed a voluntary bankruptcy petition in the United States Bankruptcy Court for the District of Nevada under Chapter 11 of the former Bankruptcy Code (11 U.S.C. § 1101 et seq.). Subsequently, Daniels-Head commenced an adversary proceeding against appellees alleging principally breach of contract, unjust enrichment, and intentional interference with a contractual relationship. Daniels-Head and N.Y. Life settled prior to the scheduled trial date in bankruptcy court. N.Y. Life is no longer a party to this action.
On June 24, 1983, the United States Bankruptcy Court for the District of Nevada, entered judgment in favor of appellees Marsh & McLennan, Mercer, and Smith-Sternau. Daniels-Head timely appealed to the United States District Court for the District of Nevada. The district court entered an order on April 16, 1985, affirming the bankruptcy court’s decision. The appellant filed a timely appeal to this court on May 14, 1985, pursuant to 28 U.S.C. §§ 1291 and 158(d).
II
APPLICABLE LAW
The present case was pending in bankruptcy court when the Supreme Court rendered its decision in Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (“Marathon”), removing jurisdiction from the bankruptcy courts. During the interim period between the effective date of Marathon, December 24, 1982, and July 10, 1984, when Congress responded to *917 Marathon by enacting the Bankruptcy Amendments and Federal Judgeship Act of 1984 (“1984 Act”), the Judicial Council of the United States approved an Emergency Rule to guide district courts in adjudicating title 11 claims. The United States District Court for the District of Nevada adopted the Rule on December 22, 1982 as Local Rule 118. Consequently, the Emergency Rule applied to the bankruptcy court’s proceedings. See Global Western Development Corp. v. Northern Orange County Credit Service, Inc., 759 F.2d 724, 725 (9th Cir.1985) (Marathon decision applies to cases pending in bankruptcy court on December 24, 1982).
While the present case was pending before the district court, the President signed the 1984 Act into law. Section 122(a) of the Act provides that it would “take effect” on the date of enactment. Section 122(b) lists exceptions dealing with mandatory abstention and jury trials in which the Act would not apply to pending cases. As this court stated in Piombo Corp. v. Castlerock Properties (In re Castlerock Properties), 781 F.2d 159, 161 (1986), “the implication is that the balance of the act does apply to cases pending on July 10, 1984.” Therefore, we will apply the 1984 Act to the present case. See Rubin v. Belo Broadcasting Corp., (In re Rubin), 769 F.2d 611, 615 n. 4 (9th Cir.1985); Creasy v. Coleman Furniture Corp., 763 F.2d 656, 659-60 (4th Cir.1985); In re Amatex Corp., 755 F.2d 1034, 1037 (3d Cir.1985); Carlton v. Baww, Inc., 751 F.2d 781, 787 n. 6 (5th Cir.1985).
ra
DISCUSSION
A. District Court’s Standard of Review
The parties disagree as to the proper standard by which the district court reviews bankruptcy court decisions. The district court acknowledged that this is an area of some confusion under the 1984 Act and chose to apply a “clearly erroneous” standard to the bankruptcy court’s findings of fact and de novo review of the conclusions of law. The district court added that its findings and conclusions would have been the same had it reviewed the bankruptcy court’s findings of fact de novo.
Appellant argues that section 104(a) of the 1984 Act, 28 U.S.C. § 157, requires de novo review of both the bankruptcy court’s findings of fact and conclusions of law. Appellees, on the other hand, contend that the 1984 Act does not apply to bankruptcy court judgments issued prior to the Act’s effective date. Bankruptcy Rule 8013, ap-pellees argue, requires district court review under the “clearly erroneous” standard.
The proper standard of review to be applied by the district court is a question of law. We review de novo all questions of law. United States v. McConney, 728 F.2d 1195, 1201 (9th Cir.) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). As discussed above, the 1984 Act applies to the district court’s proceedings. Therefore, to determine the proper standard of review, we must first examine the Act’s jurisdictional grants to the bankruptcy and district courts.
The Marathon decision invalidated 28 U.S.C. § 1471 and its broad jurisdictional grant to the bankruptcy courts. 458 U.S. 50, 87, 102 S.Ct. 2858, 2880, 73 L.Ed.2d 598. The Supreme Court held that bankruptcy courts could not enter final judgments in state-created claims related to the core proceeding arising under the federal bankruptcy laws. Id. at 87 n. 40, 102 S.Ct. at 2880 n. 40. Under both the Emergency Rule and the 1984 Act the bankruptcy courts have jurisdiction to hear such “related” claims but do not have jurisdiction to make a final determination of them absent the parties’ consent. See 28 U.S.C. § 157(c)(1); Local Rule 118(d)(3)(B); White Motor Corp. v. Citibank, N.A., 704 F.2d 254, 261-64 (6th Cir.1983) (discussing emergency, “interim”, rule).
The district court’s jurisdiction derives from 28 U.S.C. §§ 1334(b) and 157(c)(1). Generally, the district court has “original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.” 28 U.S.C. § 1334(b) (1986). Section 157(c)(1) contains a separate jurisdictional basis for proceedings that are not “core *918 proceedings” but are “related” proceedings under the Act.
A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge’s proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.
28 U.S.C. § 157(c)(1).
“Thus, the ‘essence of the jurisdictional system’ is the distinction between core and noncore matters.” Piombo Corp., 781 F.2d at 161 (citing Lesser v. A-Z Associates, Inc. (In re Lion Capital Group), 46 B.R. 850, 852 (Bankr.S.D.N.Y.1985)). Daniels-Head’s state law contract claims are “related” to the core bankruptcy proceeding. We held that similar state contract claims were related proceedings in Piombo Corp., 781 F.2d at 161-62, and the concept of relatedness under section 157(c)(1) is a broad one. DuVoisin v. Foster (In re Southern Industrial Banking Corp.), 809 F.2d 329, 331 (6th Cir.1987). Because, as discussed below, we hold that the parties consented to the bankruptcy court’s jurisdiction over these contract claims, we need not decide if the claims could be characterized as core proceedings. “A related proceeding with the consent of all parties functionally has the same effect as a core proceeding, permitting the bankruptcy court to enter a final judgment, order, or decree.” Id.
Under 28 U.S.C. § 157(c)(2), “the district court, with the consent of the parties to the proceeding, may refer a proceeding related to a case under title 11 to a bankruptcy judge to hear and determine and to enter appropriate orders and judgments, subject to review under section 158 of this title.” Section 158 gives the district courts jurisdiction over the final judgments and orders of bankruptcy courts. Thus, whether the proceedings in the instant case are deemed “core proceedings” over which the bankruptcy court had jurisdiction to enter a final judgment, 28 U.S.C. § 157(b)(1), or “noncore,” “related” proceedings in which the parties consented to the bankruptcy court’s jurisdiction to enter a final judgment, 28 U.S.C. § 157(c)(2), the standard of review applied by the district court is the same. The district court acts as an appellate court, reviewing the bankruptcy court’s findings of fact under the clearly erroneous standard and its conclusions of law de novo. In re American Mariner Industries, Inc., 734 F.2d 426, 429 (9th Cir.1984); see also In re AOV Industries, Inc., 792 F.2d 1140, 1146 (D.C.Cir.1986).
Appellant chose to file its state law claims in bankruptcy court, rather than state court. After Marathon, under the Emergency Rule, the district courts automatically referred cases arising under title 11 or related to cases under title 11 to the bankruptcy courts. However the Emergency Rule also permitted the parties to object to the bankruptcy courts jurisdiction, thus providing for de novo review in the district court. Nonetheless, appellant claims it never knowingly and voluntarily waived its right to de novo review by an Article III court.
Appellant cites Pacemaker Diagnostic Clinic v. Instromedix, Inc., 725 F.2d 537 (9th Cir.) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984), for its claim that consent must be knowing and voluntary. Pacemaker deals with section 636(c)(1) of the United States Magistrates Act. Congress apparently modeled section 157(c)(2) after section 636. 1 Collier on Bankruptcy ¶ 3.01(2)(d)(ii) (15th King ed. 1985). Yet, there are differences between the two. Section 636(c)(2) of the Magistrates Act specifically requires the parties’ explicit consent to the magistrate’s jurisdiction to make final determinations of civil matters. This section even requires the clerk of court to notify the parties of their right to consent to such jurisdiction.
The 1984 Act, on the other hand, does not, on its face, require explicit consent. The fact that Congress failed to include *919 any provision for explicit consent in the 1984 Act indicates that consent implied from the parties' actions is sufficient. See DuVoisin, 809 F.2d at 331 ("the absence of a timely objection to the bankruptcy court's jurisdiction constitutes implied consent to the resolution of the controversy"); Rainey v. International Harvester Credit Corp., 59 B.R. 987, 990 (Bankr.N.D.Ill.1986) (bringing claim and failure to timely object equal implied consent to jurisdiction); Lombard-Wall, Inc. v. New York City Housing Development Corp. (In re Lombard-Wail, Inc.), 48 B.R. 986, 992 (Bankr.S.D.N.Y.1985) ("we see no evidence in section 157(c)(2) to suggest altering the traditional rule that consent can be both express and implied"); Baldwin-United Corp. v. Thompson (In re Baldwin-United Corp.), 48 B.R. 49, 54 (Bankr.S.D.Ohio 1985) (consent may be implied from failure to object or from any act indicating a willingness to have the bankruptcy court determine a claim).
As for Pacemaker's requirement that consent be "freely and voluntarily undertaken," 725 F.2d at 543, appellant could have objected to the bankruptcy court's jurisdiction any time after Marathon became effective and the Emergency Rule adopted. Its failure to do so indicates a willingness to have the bankruptcy court adjudicate its state law claims. Moreover, appellant should not now, after fully litigating its case in bankruptcy court, be permitted to object to that court's jurisdiction. We hold that appellant's failure to object to the bankruptcy court's jurisdiction constitutes consent to that jurisdiction. Thus, under 28 U.S.C. § 158, the district court acted as an appellate court in reviewing the bankruptcy judge's decision. The district court properly applied a clearly erroneous standard to findings of fact and de novo review to conclusions of law. Our review is essentially the same as the district court's. Ragsdale v. Haller, 780 F.2d 794, 795 (9th Cir.1986).
B. Interests in Insurance Records
Daniels-Head contends that it had a property interest in the administrative insurance records it kept for the AOA plans and that under the services agreement between Daniels-Head and N.Y. Life, N.Y. Life only had a security interest in these records. Consequently, appellant argues, the transfer of the records from N.Y. Life to appellee Marsh & McLennan is subject to Article 9 of the Uniform Cormnercial Code. Under article 9, Daniels-Head argues, Marsh & McLennan was unjustly enriched as a result of this transfer because it was commercially unreasonable.
Daniels-Head's argument fails in large part because its service agreement with N.Y. Life provided that if Daniels-Head was unable to continue to perform as the administrator of a policy, "the records required for the continuing administration of such policy will be transferred to New York Life within thirty days of request by New York Life." Further, the bankruptcy court found that Daniels-Head defaulted on the agreement by failing to remit $1,200,-000 to N.Y. Life for the premiums collected from the AOA. The court also found that N.Y. Life terminated its administrative services agreement with Daniels-Head on February 19, 1980. Finally, the United States District Court in Ohio granted N.Y. Life a preliminary injunction authorizing it to copy various records held by Daniels-Head. The Ohio court found that the delivery of the administrative records to appellee Mercer "was essential to the continued administration of the AOA-N.Y. Life group insurance." The United States District Court and bankruptcy court below echoed this finding.
Appellant argues that it had a property interest and N.Y. Life had only a security interest in the records under the American Agency System and under the services agreement. The American Agency System provides guidelines for agency contracts in the insurance industry. It is customary under the System to include in such contracts a clause expressly giving the agent exclusive possession of all records upon termination of the contract. This possession is contingent upon the agent accounting for and paying all premiums due the insurance company. See Modern Home Institute, Inc. v. Hartford Accident and *920 Indemnity Co., 513 F.2d 102, 105 n. 2 (2nd Cir.1975) (describing the American Agency System). As appellant notes, provisions under the System are subject to any agreement between the insurer and the agent. See Fred Miller Co. v. Empire Fire & Marine Insurance Co., 503 F.2d 751, 755 (8th Cir.1974); Alliance Mutual Casualty Co. v. Scheufler, 203 Kan. 171, 174, 453 P.2d 15, 18 (1969).
Daniels-Head relies heavily on In re Roy Dart Insurance Agency, 5 B.R. 207 (Bkrtcy.D.Mass.1980). The court in Dart found that a contract clause similar to the one at issue here created only a security interest in the insurance company. Id. at 216. The service agreement in Dart, however, expressly provided that the records would remain the property of the agent if the agreement terminated. Id. at 210. The service agreement between Daniels-Head and N.Y. Life contained no such provision. Rather, the contract only stated that the records were to be transferred to N.Y. Life upon thirty days’ notice should Daniels-Head be unable to perform under the agreement.
Thus Dart does not support appellant’s position. Other cases cited by appellant also suffer from this factual distinction. See Fred Miller Co., 503 F.2d 751; In re Davies Insurance Service, Inc., 33 B.R. 252 (Bkrtcy.W.D.Pa.1983); Garrett v. American Family Mutual Insurance Co., 520 S.W.2d 102 (Mo.Ct.App.1974).
Appellant contends the object, if not the explicit wording, of the contract provision was to create a security interest in favor of N.Y. Life to secure Daniels-Head’s remittal of premiums. Appellant relies on Nevada Revised Statute 104.9201 and Article 9 of the Uniform Commercial Code to define a security interest as an interest in personal property which secures payment or performance of an obligation. However, the United States District Court in Ohio, the bankruptcy court, and the district court in Nevada all found the object of the provision was to ensure that N.Y. Life’s policies would be continuously administered should Daniels-Head fail to fulfill its obligations. In addition, each court found that N.Y. Life’s acquisition of the records and subsequent delivery to Marsh & McLennan was “essential” to the continued administration of the AOA-N.Y. Life group insurance policies. These findings were not clearly erroneous. Therefore, N.Y. Life did not have a mere security interest in the records and Article 9 of the Uniform Commercial Code does not apply. Consequently, appellees were not unjustly enriched by receipt of the records.
C. Intentional Interference with Contractual Relationship
Daniels-Head next argues that ap-pellees intentionally interfered with its contractual relationship with the AOA. During its negotiations with Marsh & McLen-nan for the sale of its business, Daniels-Head alleges it gave Marsh & McLennan, through its subsidiary Mercer, valuable information regarding its reverse consulting fee arrangement with the AOA. Mercer used this information, Daniels-Head contends, to gain an advantage over Daniels-Head in competing for the AOA group insurance policies and thereby interfered with Daniels-Head’s contractual relationship with the AOA. In addition, Daniels-Head claims Mercer violated its contractual obligation to Daniels-Head to keep this information confidential.
The bankruptcy court found that appel-lee Mercer did not receive any information during the negotiations for the purchase of Daniels-Head that would give Mercer an advantage over Daniels-Head in competing for AOA group insurance. The district court further found that the reverse consulting fee was not a novel concept and that an organization such as Marsh & McLennan would have knowledge of it. The bankruptcy court also found that ap-pellee Mercer did not interfere improperly with any business relationship or contract between Daniels-Head and AOA. The bankruptcy court concluded, and the district court affirmed, that the alleged contract of confidentiality was “without substance.” Although Mercer had promised Daniels-Head it would keep the information in confidence, Mercer also advised Daniels-Head that this would not preclude it from *921 ordinary competition for Daniels-Head’s clients. Moreover, the court found that Mercer had specifically declined Daniels-Head’s request to execute a contract of confidentiality.
In Island Air, Inc. v. La Bar, 18 Wash. App. 129, 566 P.2d 972 (1977), cited by Daniels-Head in support of its argument, the court set forth the elements of a prima facie case of intentional interference with a contractual relationship. A prima facie case requires that the intentional interference cause a breach of the contractual relationship. 18 Wash.App. at 135, 566 P.2d at 978. Appellees’ actions must have been the “moving force” behind the termination of Daniels-Head’s contract with the AOA before liability will attach. 18 Wash.App. at 138, 566 P.2d at 981. See also Buckaloo v. Johnson, 14 Cal.3d 815, 537 P.2d 865, 122 Cal.Rptr. 745 (1975). In the instant case, the AOA terminated its brokerage agreement with Daniels-Head because Daniels-Head failed to remit the premiums it had collected from the AOA to N.Y. Life. Moreover, the AOA solicited proposals from numerous insurance agents before selecting Mercer to replace Daniels-Head. Thus, Mercer did not cause the AOA to terminate its relationship with Daniels-Head and the bankruptcy court’s findings of fact on this issue were not clearly erroneous.
IV
CONCLUSION
The district court applied the proper standard of review to the bankruptcy court’s adjudication of Daniels-Head’s claims.. The bankruptcy court and district court correctly found that Marsh & McLen-nan was not unjustly enriched by receipt of the insurance records for the AOA plans and that Mercer did not interfere in Daniels-Head’s contractual relationship with the AOA. The district court’s judgment is
AFFIRMED.