FRANCIS H. WHITE *vs.* UNIVERSAL UNDERWRITERS
INSURANCE COMPANY & another.

Suffolk.   December 5, 1963. — April 21, 1964.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, & SPIEGEL, JJ.

*Insurance,* Agency agreement. *Accounting. Contract,* Insurance agency
contract, Modification. *Unlawful Interference. Damages,* Ascertain-
ment, Insurance "expirations," Good will. *Evidence,* Judicial notice.
*Equity Pleading and Practice,* Master: findings. *Words,* "Liability."

This court did not take judicial notice of a ruling by an administrative
official not shown before a master or the judge in a suit in equity; but
upon a remand of the suit to the trial court for further hearing on cer-
tain issues there should be an opportunity to show the ruling.   [373,
374]
Under an "agency" contract between an insurance company and an in-
surance agent originally covering the writing of automobile "physical
damage" liability insurance and later modified to include automobile
property damage liability insurance, the agent's commissions should be
calculated, pursuant to a formula set out in the contract, on the basis
of the combined data pertaining to both kinds of policies rather than
separately for each kind on the basis of the data pertaining to that
kind, where the total commissions might be different under the two
methods of calculation because of the inclusion of losses on the policies
as a factor in the formula.   [372–374]
In a provision in an "agency" contract between an insurance company
and an insurance agent fixing a time material in the final accounting
between the parties after termination of the contract as "after all liabil-
ity underlying policies issued pursuant to . . . [the contract] shall
have been terminated by expiration or cancellation," the word "liability"
did not mean obligation to pay claims and the reference was not to the
time when all claims should be liquidated or barred.   [375]
For the purposes of an accounting of commissions between an insurance
company and an insurance agent after termination of an "agency" con-
tract providing that sixty days "after all liability underlying policies
issued pursuant to . . . [the contract] shall have been terminated by
expiration or cancellation" the agent should furnish the company a list
of all known claims, which were material in the computation of commis-
sions; and the company should then render an account, where the com-
pany reinsured some of the policies as of the date of termination of
the contract and the rest of the policies expired on the following Decem-
ber 31, and the company then had in hand all data necessary for the
accounting, it should, in the circumstances, have been rendered within
sixty days after December 31.   [375]

In an accounting between an insurance company and an insurance agent of commissions as of a certain date, loss experience subsequent thereto down to the time of the most recent available figures should be used in computing the factor of a proper reserve for losses as of such date. [375–376]

Provisions of an "agency" contract between an insurance company and an insurance agent, that upon termination of the contract "expirations," meaning the exclusive right to use information in the agent's records in soliciting renewals of policies, should belong to the company or the agent as to "any particular business" depending on whether the agent had fully accounted to the company within certain times for money due it with respect thereto, were not shown to have been modified by certain assignments made by the agent to the company at the time of termination of the contract, or by the fact that about then the agent's records were placed in the company's possession only for certain limited purposes, or by certain subsequent statements by the parties as to a proposed attempt by the agent to dispose of his assets. [378–380]

A finding by a master "On all the evidence before" him should be construed in the circumstances as referring to subsidiary findings in the report rather than to evidence of unstated subsidiary facts. [380]

Under an "agency" agreement between an insurance company and an insurance agent providing that upon its termination "expirations," meaning the exclusive right to use information in the agent's records in soliciting renewals of policies, should belong to the company or the agent as to "any particular business" depending on whether the agent had fully accounted to the company within certain times for money due it with respect thereto, the burden of showing what "particular business" had been fully accounted for was, in the circumstances, on the company, not the agent, where the company shortly after the termination took full charge of the agent's office and records. [380]

In an accounting between an insurance company and an insurance agent, certain remittances of premiums by the agent to the company, if not allocated as to policies, would be properly allocated according to a reasonable accounting practice between the parties or the customary practice in the insurance business or, in the absence of any such practice, to policies in accordance with the order of their dates. [380–381]

In a suit by an insurance agent against an insurance company seeking damages for misappropriation by the defendant, upon termination of the parties' "agency" contract, of certain of the agent's "expirations," meaning the exclusive right to use information in the agent's records in soliciting renewals of policies, and consequent misappropriation of good will of the agent, the value of the good will would not be properly computed in the amount of the gross commissions for a year, but would be properly computed at two and one half times a year's expected net earnings subject to a determination whether use of a smaller multiplier would be appropriate in all the circumstances. [381–382]

A provision of an "agency" contract between an insurance company and an insurance agent, that "neither party shall have any claim upon the other for the loss of prospective profits, commissions or damage to the business" arising from termination of the contract, did not bar recovery

of damages by the agent against the company for misappropriation by it of good will of his upon termination of the contract. [382]

Upon a misappropriation of an insurance agent's good will by an insurance company and an award to him against it of damages calculated by capitalizing his prospective net earnings for a year, there should not have been an additional award to him of certain sums received by the company for a portion of that year from insurance placed with it by brokers with whom the agent had formerly dealt, since such sums had already been reflected in such capitalized prospective net earnings. [383]

In a suit for an accounting, where it appeared that the plaintiff had placed money in a special account to be drawn upon by the defendant for certain purposes and that a substantial but unascertained part of the total withdrawn from the account by the defendant had been used for other purposes, the defendant, being bound to account for the withdrawals, was chargeable with the total withdrawn. [383]

BILL IN EQUITY filed in the Superior Court on May 27, 1960.

The suit was heard by *Chmielinski, J.,* on a master's report.

*Waldo Noyes* for the defendants.

*Roger J. Donahue* (*George F. Hurley* with him) for the plaintiff.

WHITTEMORE, J. White brought this bill for an accounting under an insurance agency contract against "Universal Underwriters, a reciprocal insurance exchange Lynn Underwriting Company, Manager" (Universal), a Missouri corporation. The bill was filed May 27, 1960, and was later amended. Universal, by counterclaim, joins in the demand for an accounting and alleges a balance due it. White also claims damages against Universal for breach of the agency contract and for "other action." White claims from the other defendant, Universal Underwriters Insurance Company (Insurance Company), another Missouri corporation, a legal fee and expenses for obtaining a license to do business in Massachusetts. Universal and Insurance Company have appealed from a final decree that awarded White $142,540.35 against Universal and $8,747.50 against Insurance Company.

The facts are set out in a master's report. The agency contract between White and Universal is in three documents

executed on April 18, 1958 (exhibits 1, 2, and 3), an addendum executed on January 5, 1959 (exhibit 4), and an oral agreement of the same day set out in paragraphs 2 to 9, inclusive, of a letter dated January 13, 1959, from Universal's vice-president and general manager, T. R. Krings, to White and his general manager.

Exhibit 1 is a comprehensive "Agency Agreement" that designated White, under the style of Interstate Insurance Agency (hereinafter White), as an agent to place "Automobile Physical Damage Insurance" with Universal. The agreement contains a provision for payment to White of so called retrospective commissions. To determine the commissions due at any time there is deducted from eighty-five per cent of the earned premiums on all policies placed with Universal since the inception of the contract, the total of losses paid on the policies, a reserve for losses incurred but not paid, and commissions theretofore paid. Earned premiums are those allocable to the period prior to the date of the particular accounting. By other provisions of exhibit 1, Universal was to send to White monthly statements of premiums due Universal and to render quarterly accountings for commissions due.

Exhibit 2 is a "General Agency Agreement" whereby Universal appointed White exclusive general agent for Massachusetts for material damage automobile insurance, that is "Automobile Fire, Theft, Comprehensive and Collision" insurance. This agreement gave White power to bind the company in designated amounts, to appoint, transfer and close agencies, and to collect and hold in trust premiums. Exhibit 3 amended exhibit 1 to provide for an additional contingent commission. This commission was to be computed as of April 30 of each year. It was to be a percentage of net premiums written during the yearly period. The percentage increased with the total net annual premiums written. This additional commission was to be paid, however, only if eighty-five per cent of the premiums earned in the year exceeded the losses allocable thereto. Exhibit 4, effective retroactively from October 1, 1958,

amended the agency agreement (exhibit 1) to extend the agent's authority to include the solicitation and sale of automobile property damage liability insurance within stated limitations.

By June 1, 1959, White had written physical damage policies calling for "net written premiums of $243,946.52, and property damage policies calling for net written premiums of $242,240.16, or a total . . . of $486,186.68." Prior to June 1, White had remitted $291,906.61 to Universal and had been paid $353.06 in commissions.

In late May, 1959, Universal and White agreed to terminate the agency contract. They also agreed that Universal would undertake the collection of outstanding accounts receivable, and would service the policies. The costs of so doing were to be met out of a special account set up by White upon which Universal might draw.

The agency contract was terminated June 1, 1959, and at the same time White assigned to Universal accounts receivable from brokers for policies placed by him with Universal and commissions receivable from Universal. The assignment was "for the purpose of securing the performance of . . . [White's] overdue and undischarged obligations to . . . Universal . . . ." Also effective June 1, 1959, Universal reinsured with another company all risks insured under the physical damage policies placed by White and granted to the reinsurer all subrogation rights. The cost of the reinsurance was seventy per cent of the premiums allocable to the period after June 1, 1959. Universal and White agreed that they would divide equally the balance of these premiums.

Article 12 (a) of the agency agreement dealt with the right to "expirations" on termination of the agreement.[1]

---

[1] Exhibit 1, art. 12 (a), provides: "In the event of termination of this agreement, Insurance Agent having promptly accounted for and paid over premiums for which he may be liable, Insurance Agent's records and use and control of expirations on business accepted by Company shall remain the property of Insurance Agent and be left in his undisputed possession; provided, however, that as to any particular business placed with Company by Insurance Agent, as to which Insurance Agent has not, within 30 days after termination, fully accounted to Company for monies due it, then the records and expirations

The general agency agreement contained a more general, but consistent, provision as to expirations and as to the "agency plant."

The parties by "expirations" meant the exclusive right to use, in soliciting renewals, the information in the records kept by White such as the initial and termination dates of each policy and the name of the broker. By "agency plant" the parties meant "the relations between White and his brokers, and the goodwill arising therefrom."

White, on June 10, 1959, deposited $8,783.51 in the special account. Two letters dated June 4, 1959, and July 17, 1959, each addressed to Universal authorized the payment from the account of rent and certain office expenses.

After June 1, 1959, Universal took charge of White's office on Broad Street, Boston. In late June Universal opened on Franklin Street another office to handle claims. On July 1 White's old office was moved to quarters adjacent to the new claims office. On October 1, White's office was closed and the records were moved to Universal's adjacent office. About January 1, 1960, this office was moved by Universal to quarters in Wellesley. After June 1, 1959, the Universal personnel in Boston and Wellesley collected accounts receivable owed White, serviced the physical damage and property damage policies, and wrote additional property damage policies through brokers who "prior to June 1, 1959, sent their business to Interstate."

Other facts are stated below.

1. *The accounting between White and Universal.*

We consider first the method for determining White's commissions. The master computed commissions under three alternative theories. The first theory is that physical

---

as to that particular business shall be turned over to Company and Company is hereby authorized to retain such records and expirations and to renew such expirations; collect monies due and do such other things in connection therewith as it deems fit, under, however, the following conditions: In the event that Insurance Agent within ninety days after termination of this agreement make full accounting to Company for monies due it on account of any such business, then such expirations and records on that particular business shall be returned to the possession and the exclusive control of Insurance Agent."

damage and property damage figures are to be combined in computing commissions due under the retrospective commission provisions. The second theory calls for computing separately the total commissions under the physical damage policies and under the property damage policies. This gives a higher total of commissions as the losses that accrued before the date of the reinsurance of physical damage policies exceeded eighty-five per cent of the premiums allocable thereto. The third theory yields the highest commission. Under it the property damage commission is to be computed under the retrospective provision but the physical damage commission is to be ten per cent of the premiums written. This percentage is said to be required by a ruling of the Insurance Commissioner. The final decree determines commissions under this theory.

The master's report states: "I am unable to find that such a 'ruling' was ever promulgated. I further find that Universal and . . . [White] took no action to modify, rescind or terminate any contract between them as a result of" a conference with an investigator of insurance advertising, at which the latter told White and Krings that the physical damage contract violated the law because it did not contain a provision for a minimum commission of ten per cent and that his statement was based on a ruling of the Commissioner.

White asserts that he could now produce the ruling. We do not take judicial notice of rulings of administrative officials. *Finlay* v. *Eastern Racing Assn. Inc.* 308 Mass. 20, 26–28. The record does not show that the ruling was before the judge. There was no motion to recommit so that it could be introduced before the master.

We hold that as between the first and second theories the first is correct. The January, 1959, addendum extended the authority to place insurance to include a second category, but it left the accounting and retrospective commission provisions applicable to the combined results. This, we think, is the reasonable construction of the formal contracts. It is confirmed by the letter of January 13, 1959, from Krings

to White. This called for monthly retrospective statements including "3 . . . (e) Combined physical damage and property damage statement showing the total result under the contract." The monthly statements were rendered accordingly. There is no suggestion that White did not acquiesce in this accounting.

We see no ambiguity and no occasion to determine whether, as White urges, this is the kind of contract to be construed against the insurer. See *J. D'Amico, Inc.* v. *Boston,* 345 Mass. 218, 224. We note, however, that if the experience under the physical damage policies had been good, the first theory would have yielded the higher contingent commission.

On the case as it now stands, therefore, the commissions are to be determined on the combined basis. However, since, as will appear, the case must be remanded, White should have an opportunity to show the asserted ruling. If the ruling is found valid and applicable (as to which we intend no suggestion), the commissions are to be determined consistently therewith. No statute supporting such a regulation has been called to our attention.

We note that there may be an error in the computation of White's commission that should be corrected on remand.[2]

We next consider the date for computing premiums, losses, and the reserve for losses. The report states figures for December 31, 1959, and September 30, 1960, this latter being the most recent for which figures were available. The final decree adopts the December 31, 1959, figure. This, for reasons to be stated, was error.

---

[2] The report does not show whether White wrote any policies after April 30, 1959. If he did the report is in error in computing the contingent commission. The basic figure under the original agreement is eighty-five per cent of the total net premiums. From this base are to be deducted the losses, the reserve for losses, and commissions previously paid. The result is the commission under exhibit 1, art. 4 (a). The additional contingent commission is to be separately computed and for two periods. The total of the net premiums through April 30, 1959, fixes the percentage rate applicable thereto as set out in exhibit 3 for use in determining the contingent commission for that period. The total of the net premiums after April 30, 1959, fixes the percentage rate applicable thereto for this second period. The computation in the report used, for the contingent commission, a single percentage figure determined by the total net premiums. The computation added this percentage figure (1.5%) to eighty-five per cent and, by applying this percentage to the total net premiums, obtained a final figure for White's commission.

Universal contends that it is to pay White only when all its liabilities under the policies are liquidated or barred. We disagree. Article 12 (b) of exhibit 1 controls. It provides that sixty days "after all liability underlying policies issued pursuant to . . . [the agreement] shall have been terminated by expiration or cancellation" White should furnish to Universal a list of all known claims. Universal was then to account in the same manner provided for the computation of retrospective commissions. Thus, final accounting was called for at a time when some losses under the policies would have to be estimated and reflected in the reserve.

For accounting purposes, we hold that Universal's liability on the physical damage policies ceased on June 1, 1959, at the time the risks on those policies were assumed by the reinsurer. True, "all liability" under these policies had not necessarily "been terminated by expiration or cancellation." The policies were not written for calendar years and Universal's legal liability as original insurer continued notwithstanding reinsurance. But Universal and White intended, we conclude, that as between themselves the reinsured policies should represent closed business. The accounting should reflect this. The property damage policies ran for a calendar year and expired December 31, 1959. Hence all liability on property damage policies placed by White had terminated by that date. We see nothing in Universal's contention that "liability" in art. 12 (b) means obligation to pay claims. The meaning is made plain by the modifying words "been terminated by expiration or cancellation."

Under art. 12 (b) the time for the final accounting would have been promptly after the receipt from White of the list of claims. Here, however, all the data needed to render an account was in Universal's hands. The final account, therefore, should have been rendered by Universal on the sixtieth day after December 31, 1959, that is, on February 29, 1960.

There remains the issue whether the loss experience subsequent to February 29, 1960, should be used in computing

the reserve figure as of that date. We think it should. A reserve for losses is only an estimate of losses incurred but uncertain in amount. See American Institute of Accountants, Accounting Terminology Bulletin No. 1 (1953) §§ 59 (2), 59 (4). Equity should not blind itself to facts that show with greater precision what the reserve figure should have been as of the accounting date. This rule, we think, would not unreasonably invite nonperformance by a party who might anticipate that upon accounting on the basis of an estimated reserve he would owe a substantial balance. In such case the obligation should be treated as liquidated as of the date the account should have been stated, and interest would be paid from that date. It is, therefore, inconsequential that the report does not show loss and reserve figures as of February 29, 1960. The total of losses and the appropriate reserve for that date is now to be stated as equal to the total of the losses on the most recent date for which figures are available and a reasonable reserve as of that date. In other words, the commissions should be computed as of the most recent date for which figures are available.

According to an affidavit attached to a motion to recommit, the master submitted his report to the court below approximately a year and nine months after hearings before him had ended. Universal then moved to resubmit the report to the master to bring the loss and reserve figures up to date. It was within the discretion of the court to deny the motion. As the case is to be remanded, however, Universal is to have the opportunity to bring the figures up to the date of the new hearing.

The accounting under the termination agreement of June 1, 1959, should, of course, be on the basis of the most recently available figures. There is no controversy as to this. On remand the account may be brought up to date in this respect also by including credit to White for accounts receivable collected since June 30, 1960.

2. *White's claim that Universal wrongfully appropriated his expirations and the good will of his business.*

The master found, in accordance with White's contention, that Universal appropriated such of White's expirations, and so much of the "agency plant," as related to the automobile property damage business. The physical damage business was not involved in the claim. The report stated alternative theories of damage, finding the amount of damage under one theory to be $77,000 and, under the other, $43,500.

The final decree awards damages for this claim in the amount of $77,000.

The master's subsidiary findings show that Universal, in soliciting renewal business and new business, made use of information obtained by it while operating White's agency office. Universal contends that it was entitled to do this and in any event that the damages are improperly computed.

We look first at the merits of the claim. Under art. 12 (a), exhibit 1, if White did not, within thirty days after the termination date, fully account to Universal for "monies due it" for "any particular business," Universal might as to that item "retain . . . records and expirations and . . . renew . . . expirations; collect monies due and do such other things in connection therewith as it deems fit." (See fn. 1, *supra.*) This was subject to the proviso that White might reclaim "such expirations and records on that particular business" by making full accounting for monies due it thereon within ninety days of termination. Thus the expirations as to any item for which White had not fully accounted by August 30, 1959, for "monies due" Universal belonged to it. The remainder belonged to White.

On the theory, which we have adopted, of computing commissions by combining the results of the two lines of business, the master found that White owed (a) $185,775.86 as of April 30, 1959, and (b) $172,747.99 as of May 31, 1959. The master found, however, that, although one or the other of these amounts was "due" on June 1, 1959, nothing was "payable" from White to Universal on that date. The finding is based on art. 7 of the agency agreement. That article required that Universal send to White accounts of premiums due and that White pay over the premiums

eighty-five days after the end of the month for which the account was rendered.

The master found that the only accounts in evidence were the monthly statements that showed the computation of White's retrospective commission. These statements showed the total premiums for policies written but they did not show White's payments or the balance due Universal.[3]

It is inconsequential to the rights of the parties under art. 12 (a) whether, before termination, Universal had rendered statements under art. 7. Article 12 (a) is concerned with amounts "due," not with amounts "payable." Moreover, Universal on June 1, 1959, took over the active management of the agency office and knew how much was owing for premiums. Thereafter Universal stood in White's place in respect of doing those things that must be done, at least by August 30, 1959, in respect of "any particular business" in order to save that business or reclaim it for White.

We hold that the parties did not, by their June 1, 1959, termination commitments, alter the disposition of the expirations specified in the agency agreement. Universal received no interest in the expirations by virtue of the assignment of accounts and commissions receivable. The items assigned were only these: (1) all accounts receivable arising out of premiums paid or to be paid "under all policies issued by Universal . . . with respect to which . . . [White has] acted as 'insurance agent' ''; and (2) "[a]ll commissions . . . due or . . . to become due from Universal . . . with respect to or arising out of . . . policies or coverages written by . . . [White] for . . . Universal . . . as its 'insurance agent.' ''

The master found that at the time the agency agreements were terminated there was no discussion of expirations or of applications that might be received at White's office subsequent to termination. The master also found, however, as follows: "On all the evidence before me as to the termination agreement, . . . the parties intended that the exclusive right to the expirations and the agency plant remain in

---

[3] Affidavits of counsel for Universal attached to motions to recommit refer to other regular statements said to show the credits and the balance due.

White. In making this latter finding I rely in part on the following finding: shortly after June 1, 1959, and prior to June 17, White told Krings that he proposed to attempt to dispose of his assets, including the expirations; Krings stated orally, and in a letter to White dated June 17, that Universal approved. . . . I find that under the termination agreement the dailies and other records of . . . [White] were to be placed, and were placed in the possession of Universal for the following purposes only: (1) the collection of accounts receivable, (2) the servicing of existing policies."

The master does not expressly find that the parties modified the original agency agreements. But, in order to give White "the exclusive right in the expirations and the agency plant" it would have been necessary to make such a modification.

The subsidiary facts found by the master are in law insufficient to show such a modification of the underlying writings. The master's findings as to the intention of the parties are in no way inconsistent with the continuance of rights under the agency agreements. The absence of discussion as to "expirations" or "applications that might be received" points to continuance of rights therein under the agency agreements rather than any change therein. White's statement after June 1, 1959, that he "proposed to attempt to dispose of his assets, including the expirations," and Krings's statement and writing to White that "Universal approved" are consistent with White's full ownership of expirations and the agency plant, but they do not indicate any agreement to that effect. They are also consistent with an intention in White to dispose of his assets, including expirations, subject to Universal's rights therein. At best for White they may show his belief, after the new contract had been made, that he owned the expirations unencumbered, and that Krings encouraged that belief. This falls short of a showing of modification of the written agreements.

The finding that "under the termination agreement the dailies and other records of . . . [White] were to be placed,

and were placed in the possession of Universal . . . only [for]: (1) the collection of accounts receivable, (2) the servicing of existing policies," is not inconsistent with the continuance of rights in expirations under the agency agreements.

In view of the requirement of the order of reference that the master report all subsidiary findings and the care with which the full report states such findings, we construe the master's reference to "all the evidence" as a reference to the relevant subsidiary findings in the report rather than to evidence of unstated subsidiary facts.

The master found "that White had not fully paid Universal by July 1, 1959, all monies owed it on account of policies written for it by White . . . [and] that on the evidence . . . it is impossible to find that any 'particular business' had or had not been fully accounted for or paid for by July 1, 1959, since no evidence was introduced as to the application to particular accounts of payments made by . . . [White] prior to June 1, 1959, or of monies collected by Universal after June 1, 1959." We assume that, likewise, there was no evidence from which the master could have found whether any particular business had been accounted for by August 30, 1959.

Universal contends that the burden of proof as to "particular business" fully accounted for was on White and that, therefore, no damages can be awarded White for appropriation of expirations. We disagree. All White's records were in Universal's hands. We hold that Universal at the end of the thirty days after June 1, 1959, was obliged to state an account to show each item of "particular business" on which premiums had been fully received by Universal. The expirations referable to that business should then have been made available to White. If such remittances as White made prior to June 1, 1959, were not allocated as to policies, and there was a reasonable accounting practice between them or such a practice customarily applied in such cases in the insurance business, the accounting could appropriately have been in accordance therewith. In the absence of any such applicable special rule it would be appropriate

to apply remittances to policies in order of their date. Receipts between June 1 and July 1 were, of course, allocable to the policies for which the premiums had been paid.

Universal had a like obligation at the end of ninety days and, having received payments in the meantime, should have had no difficulty in making the allocation to items of particular business.

Universal was obliged to release to White the rest of the records in respect of the items then fully accounted for and to refrain from interfering with White's efforts to capitalize on the expectations of renewal.

We turn now to the computation of damages. The master computed damages on the basis that all the expirations on property damage business belonged to White. Since the total of expirations at all times unpaid shows that a substantial number of expirations passed to Universal this was error and the case must be remanded for further findings to allocate the expirations between Universal and White and to value the expirations allocated to White and the accompanying agency plant. In the discretion of the trial court these and other findings on remand may be made by the court or a master. *Tobin* v. *Cody,* 343 Mass. 716, 724. *Frank* v. *Frank,* 335 Mass. 130, 137.

The master based his findings as to damages "on the principle that the plaintiff is entitled to recover the value of the goodwill of which he has been deprived." This rightly recognized two components of value: the value of the renewal business generated by the expirations and the value of the new business which would flow from the broker relationships. The master computed damages on two theories. Under one theory the damages were assessed at one times the gross commissions on property damage business for a year, or $77,000. This amount was awarded by the final decree. Under the other theory the damages were taken to be two and one half times net commissions on property damage business, that is, damages of $43,500.[4] We re-

---

[4] The report appears to understate the amount by $500. The expected yearly net earnings are stated as $17,600. Two and one half times this sum is $44,000, not $43,500 as the report states.

ject the first theory. Such a method of valuation would yield the same value for like enterprises with like receipts, regardless of very different net earnings. On the findings the second method is appropriate for "valuing an agency" and also for valuing such assets of an agency as White had.[5] On remand, therefore, this method may be used to value these assets subject to a determination whether in the circumstances a smaller multiplier is required. That the fewer expirations to which White was entitled would give a less firm base for agency business is a new factor to be weighed in the light of the other circumstances. These include the absence of an existing agency relationship, whether White could have reëstablished an agency with these assets or could have sold them to one having an agency connection, and the effect of White's financial difficulties. It will of course be necessary to determine, as the figure to be capitalized, the probable net earnings ascribable to such expirations and agency plant as belonged to White.

Difficulties in determining the amount of damages are not a bar to their recovery. *Agoos Leather Cos. Inc.* v. *American & Foreign Ins. Co.* 342 Mass. 603, 608–609. Compare *White Spot Constr. Corp.* v. *Jet Spray Cooler, Inc.* 344 Mass. 632.

We do not agree with Universal's contention that the award of damages is barred by the general agency agreement (exhibit 2) which provides, in part, that "neither party shall have any claim upon the other for the loss of prospective profits, commissions, or damage to the business" arising from termination. This does not bar an award of damages where the allocation of expirations on termination provided in the agency agreements was not followed and where Universal used White's agency plant for purposes other than those provided by the agreement of June 1, 1959.

---

[5] The master found "that a generally known and accepted method of valuing an agency is to value separately the goodwill inhering in each line of business carried." Inferentially he found that valuing an agency in this way involves capitalizing the expected income. He also found that if it is not permissible to use gross commissions as the measure the value of White's good will is two and one half times the net commissions.

3. *Business written between June 1, 1959, and December 31, 1959.*

In the final decree White was awarded an additional sum of $35,242.17 as to which Universal was declared to be a constructive trustee. This amount represented the gross premiums for the second six months of 1959 on insurance placed with Universal by brokers with whom White had formerly dealt. It is difficult to see how Universal could be constructive trustee as to any amount greater than the commissions White could have expected on that business. In any case, none of this amount should be awarded White. So far as assets of his agency were appropriated, this occurred on June 1, 1959. To award White commissions he would have made during the next six months would result in a double recovery, for such commissions are reflected in the capitalization of earnings to give the value of White's expirations and agency plant. See point 2 above.

We see nothing in Universal's claim that the commissions allocable to the $35,242.17 were reflected in commissions awarded White in the accounting dealt with in point 1 of this opinion.

4. *White's claims for misuse of the joint account and the reinsurance profit.*

The decree below properly awarded White $5,652.08 for checks drawn by Universal on the special account. The master found that a substantial part of this amount was drawn for purposes other than the payment of expenses for servicing business placed by White with Universal, that he was unable to find how much and that, if bound to account for the $5,652.08, Universal had not done so. We rule that Universal was bound to account for these withdrawals. Universal has not shown what part of this amount was not properly drawn, and we think, therefore, that the whole amount must be awarded White. *Armory* v. *Delamirie,* 1 Strange, 505, 506.

It was proper for White to be credited with one half the net commissions on physical damage business above the cost of reinsurance or $18,186.26.

5. *White's claim for services against Universal Underwriters Insurance Company.*

The final decree, following the master's report, awards White $7,500 with interest for legal services performed by him for Insurance Company. Universal and Insurance Company do not press their appeal as to this provided the decree stays levy of execution pending White's paying whatever is found due Universal. We see no error in the decree in this aspect. The relationship between Universal and Insurance Company is to be determined on remand, and if, in the light thereof, the judge in the Superior Court shall deem the requested stay reasonable, suitable provision therefor may be included in the decree.

6. In view of our rulings we deem it unnecessary to deal with Universal's and Insurance Company's exceptions to the master's report and their abortive attempts to have the case recommitted to the master.

7. The final decree is reversed. The case is remanded to the Superior Court for further proceedings consistent herewith.

*So ordered.*