**In re ROY A. DART INSURANCE AGENCY, INC., Debtor.**

**SAINT PAUL FIRE & MARINE INSURANCE CO., Plaintiff,**

v.

**ROY A. DART INSURANCE AGENCY, INC., American Protection, Lumbermans Mutual Casualty, American Motorists, American Manufacturers Mutual, Federal Kemper Insurance Co., and Agency Assistance Corp., Defendants.**

**Bankruptcy No. 80–433–HL.**
**Adv. No. 80–0311.**

United States Bankruptcy Court, D. Massachusetts.

July 9, 1980.

Stephen M. Richmond and Bertin C. Emmons, Kaye, Fialkow, Richmond & Rothstein, Boston, Mass., for plaintiff.

John F. Drew, Richmond, Rosen, Crosson & Resnek, Edward T. Dangel, III, Dangel & Sherry, Boston, Mass., for defendant-debtor.

Bernard P. Rome, Wasserman & Salter, Boston, Mass., for defendants Kemper Group & Agency Assistance Corp.

William A. Brown, Boston, Mass., trustee.

Melvin S. Hoffman, Barron & Stadfeld, United States Trustee, Boston, Mass., for trustee.

## OPINION ON EXPIRATION

HAROLD LAVIEN, Bankruptcy Judge.

The issue for determination in this proceeding arises from the following facts. The Chapter 11 debtor, Roy A. Dart Insurance Agency, Inc. (formerly known as A. John Cohen Insurance Agency, Inc.) was an independent insurance agency for many years during which time the agency was authorized to write insurance through several insurance companies including St. Paul Fire & Marine Insurance Company ("St. Paul"). The debtor * has filed a complaint to sell the agency's goodwill and expirations. St. Paul has objected to the sale and has claimed ownership of the expirations under its agency agreement with the debtor and therefore seeks a declaration by this court of its title and right to sell the expirations. The Kemper group[1] and Agency

---

\* William A. Brown was appointed trustee on June 10, 1980 and was subsequently substituted for the debtor-in-possession.

1. For purposes of convenience, the court's references to the "Kemper group" in this opinion refers to a number of insurance companies who claim a security interest in the debtor's assets deriving from one security agreement. The companies included within the "Kemper group" are the American Protection Insurance Co., Lumbermans Mutual Casualty Co., American Motorists Insurance Co., American Manufacturers Mutual Insurance Co., and Federal Kemper Insurance Co.

Assistance Corp. oppose St. Paul's complaint for injunction and declaratory relief. Both Agency Assistance Corp. and the Kemper group claim a security interest in the expirations arising out of security agreements that were recorded on April 12, 1978 and November 6, 1979 respectively. The alleged secured parties, the debtor, and the trustee all contend that St. Paul's agency agreement with the debtor merely operated to retain a security interest in the expirations which is inferior to their interests in that St. Paul failed to record its interest. There is no dispute that St. Paul has not recorded a security interest for the expirations at issue.

> The term 'expirations' has been defined as embodying records of an insurance agency by which the agent has available a copy of the policy issued or records containing the date of the policy, name of the insured, date of expiration, amount of insurance, premiums, property covered, and terms of insurance, such information enabling the agency to contact the insured before expiration and furnishing it with information to secure another contract. Such information is of vital assistance to the agency in carrying on the insurance business and is recognized as a valuable asset in the nature of goodwill.

4 *Couch on Insurance* 2d § 26:428 at 407 (1960).

In Massachusetts, "expirations" has been further defined as

> the exclusive right to use, in soliciting renewals, the information in the records . . . such as the initial and termination dates of each policy and the name of the broker.

*White v. Universal Underwriters Insurance Co.*, 347 Mass. 367, 372, 197 N.E.2d 868, 871 (1964).

In essence, the "expirations" of an insurance agency represent the major portion of the actual value and goodwill of the agency business. The determination of ownership of the expirations is therefore of the utmost importance.

An examination of the historical treatment of expirations reveals that in the early development of the insurance industry the right to expirations as between the insurance company and the agent was governed by standard principles of the law of agency. The agent was essentially the employee of a single company. All of the agent's or servant's activity and loyalty was for his master or principal. Hence, the expirations belonged to the principal, the insurance company, and not to the agent. *See, e. g., Alliance Insurance Co. v. City Realty Co.*, 52 F.2d 271, 276 (M.D.Ga.1931). As the American insurance industry grew, however, the relationship between the agent and the insurance company was altered. No longer did the agent solicit insurance business simply for one insurance company, but rather the agent solicited business on behalf of itself, at its own expense, and placed the policies with whichever affiliated company it desired much the same as an independent distributor places orders for direct shipment with different manufacturers.

The modern insurance agent is no longer analogous to the traditional principal-agent relationship. The insurance agent is not an employee of the insurance company soliciting business on its behalf but rather is an independent businessman soliciting business on his own behalf. The insured seldom, if ever, seeks to be insured by a particular company but only seeks coverage and leaves the choice of insurance companies up to his agent or broker who then places any particular risk where he considers it most advantageous. The choice of insurance company is made independently by the agent based upon such considerations as the amount of commission, his need to keep a variety of companies satisfied with a diversity of risks, the difficulty in placing a particular risk, any special needs of the insured, and a variety of additional considerations personal to the agent and quite probably different for different agents. The agent pays his own sales expenses and overhead, has the responsibility of financing premiums beyond the companies' initial credit period, and bears personally and directly the risk of nonpayment. At least until nonpayment,

the insurance company scrupulously avoids direct contact with the insured by sending all billings, endorsements, and other communications to the agent and not to the insured. In a real sense the agent and not the insured is the company's customer. *See, e. g., In re Fernandes Super Markets, Inc.,* 5 Bankr.Ct.Dec. 1056, 1057, 1 B.R. 299 (Bkrtcy.D.Mass.1979).

■ As a result of the changed relationship between the insurance company and the insurance agent, the standard rule that information gathered on behalf of the principal belonged to the principal was no longer applicable to the insurance industry's practice. Instead, the rule recognized the fact that an agent who solicited business on behalf of his agency and not on behalf of a particular insurance company was as a matter of both fact and law the rightful owner of the records and information, that is, the expirations. *See, e. g., Heyl v. Emery & Kaufman, Ltd.,* 204 F.2d 137, 139–40 (5th Cir. 1953); *Alliance Insurance Co. v. City Realty Co.,* 52 F.2d 271, 276 (M.D.Ga.1931); *Ballagh v. Polk-Warren Mutual Insurance Ass'n.,* 257 Iowa 1334, 136 N.W.2d 496, 500–501 (1965). The independent insurance agent has the property interest in the customers and business which he has cultivated and is indeed the rightful owner of the expirations. Quite naturally, however, the insurance companies, concerned about potential unpaid premiums, sought by contract to insure themselves a measure of security. When the agency contract provides for the transfer, assignment, forfeiture, or other disposition of the expirations, the contract controls. *See, e. g., Alliance Mutual Casualty Co. v. Scheufler,* 203 Kan. 171, 453 P.2d 15, 18 (1969). In the insurance industry, the security insisted upon by the insurance companies became known as the American Agency System.[2]

2. American Agency System is the term applied to the principle agreed upon generally by insurance companies and independent agents relating to the ownership of expirations. It provides that upon termination of an agency agreement, if the agent has promptly accounted for and paid over premiums for which he is liable, his records and the use and control of

In the present case, a contractual provision does exist. Paragraph 15 of the Agency Agreement between St. Paul and the debtor provides:

15. In the event of termination of this Agreement, the Agent having promptly accounted for and paid over premiums for which he may be liable, the Agent's records, use and control of this Company's expirations, shall remain the property of the Agent and be left in his undisputed possession; and that said Company's record or knowledge of names of insureds and expiration dates shall not be referred or communicated by said Company to any other Agent or Broker or Person nor used by said Company for purposes of solicitation and all provisions of the Agency contract pertaining to ownership of expirations shall also apply to any direct billed policies; otherwise the records, use and control of the Company's expirations shall be vested in the Company.

   a. Should a difference of opinion exist with respect to balances owed the Company by the Agent, the Agent shall immediately post collateral acceptable to the Company in the amount of such balances to be held by the Company until the differences are resolved.

   b. Posting of collateral as provided shall retain for the Agent ownership of this Company's expirations.

■ The mere fact that a contractual provision exists, however, does not end our inquiry. The court must determine the meaning of that provision in its commercial context as it may affect third parties. The cases cited by St. Paul, *i. e. Heyl v. Emery & Kaufman, Ltd.,* 204 F.2d 137 (5th Cir.

the expirations shall remain his property and be left in his undisputed or undisturbed possession; otherwise the records and use and control of expirations shall be vested in the company.

*Ballagh v. Polk-Warren Mutual Insurance Ass'n,* 257 Iowa 1334, 136 N.W.2d 496, 497–98 (1965).

1953); *Alliance Ins. Co. v. City Realty Co.,* 52 F.2d 271 (5th Cir. M.D.Ga.1931); *Ballagh v. Polk-Warren Mut. Ins. Ass'n.,* 257 Iowa 1334, 136 N.W.2d 496 (1965); *Woodruff v. Auto Owners Ins. Co.,* 300 Mich. 54, 1 N.W.2d 450 (1942); *Port Inv. Co. v. Oregon Mut. Ins. Co.,* 163 Or. 1, 94 P.2d 734 (1939), dealing with these contractual provisions are limited to the disposition of the expirations as between the agent and the insurance company. These cases, however, do not address the issue presently before the court. The distinguishing factor of the present case is that we are not simply dealing with the relationship and contractual rights as between an agent and an insurance company, but are dealing with an insurance company claiming ownership interests and competing parties claiming superior security interests. Certainly as between the insurance company and the agent any lawful agreement is enforceable and the question of the potential involvement of the notice by recording requirements of the Uniform Commercial Code is purely academic—the insurance company would prevail just as the holder of an unrecorded mortgage or deed or security interest would prevail as between the parties. The rights of the contracting parties, and after all a deed, mortgage or security agreement is simply evidence of a contract, are private and are controlled by their agreement absent some particular legal impediment or condition.

St. Paul argues that Paragraph 15 of the agency agreement vests the ownership rights to the expirations in St. Paul with a possible transfer of ownership to the agent if he properly accounts and pays over premiums for which he is responsible. Therefore, St. Paul contends that full payment of premiums was a condition precedent to any rights of the agent in the expirations not only the unpaid expirations but all expirations placed with St. Paul.[3] On this basis St. Paul concludes that the various parties claiming security interests in the expirations could be in no better position than the agent who had no ownership rights unless

payment in full was tendered. There is no dispute that the debtor has not fully paid premiums due to St. Paul. Hence, St. Paul claims ownership rights free from any security interests inasmuch as there was no property of the debtor to which the security interest would attach. *See,* M.G.L. c. 106, § 9–203(1)(c) (security interest does not attach and is not enforceable unless debtor has rights in collateral).

The alleged secured parties and the trustee on the other hand claim that St. Paul's interest in the expirations was no more than a security interest which was unperfected and, therefore, inferior to their perfected security interests. These parties contend that the language of Paragraph 15 indicates that St. Paul was to acquire the agent's rights in the expirations only if the agent defaulted in the payment of premiums. As such, Paragraph 15 is simply a condition subsequent functioning as the usual security agreement to cause the transfer assignment, or forfeiture of the debtor's property on breach of a duty to pay or perform some obligation.

Section 1–201(37) of the Uniform Commercial Code, M.G.L. c. 106, § 1–201(37), defines "security interest" as "an interest in personal property or fixtures which secures payment or performance of an obligation." Section 9–102(1) of the Uniform Commercial Code, M.G.L. c. 106, § 9–102(1), sets forth the policy and scope of Article 9 in the following manner:

(1) Except as otherwise provided in section 9–103 on multiple state transactions and in section 9–104 on excluded transactions, this Article applies so far as concerns any personal property and fixtures within the jurisdiction of this state

(a) to any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangi-

---

**3.** The logical extension of this agreement appears to require forfeiture of 100% of the expi- rations of policies placed with St. Paul if but one $10 premium is overlooked and unpaid.

bles, chattel paper, accounts or contract rights; . . .[4]

The Uniform Commercial Code Comment to section 9–102 states

The main purpose of this Section is to bring all consensual security interests in personal property and fixtures under this Article, except for certain types of transactions excluded by Sections 9–103 and 9–104.[5]

Therefore, Article 9 of the Uniform Commercial Code will apply to the transaction in question if the transaction was intended to create an interest in the type of property specified in section 9–102 for the purpose of securing payment or performance of an obligation. In determining the nature and intent of the transaction in question, the court first looks to the language of the agency agreement. Paragraph 15 of the agency agreement provides:

In the event of termination of this Agreement, the Agent having promptly accounted for and paid over premiums for which he may be liable, the Agent's records, use and control of this Company's expirations *shall remain the property of the Agent and be left in his undisputed possession.* (emphasis added).

Paragraph 15 later states:

*otherwise* the records, use and control of the Company's expirations *shall be vested* in the Company. (emphasis added).

The language on its face would clearly indicate a transfer of ownership to the company only upon default of the agent. The use of the word "remain" indicates that the parties intended that the ownership interest in the expirations resided in the agent prior to the termination and subsequent default in payment of premiums. This is entirely consistent with the rule of law declaring the independent agent the owner of the expirations. The court also notes that the agency agreement in question is a standard form prepared by St. Paul. To the extent that any ambiguity exists in Paragraph 15, such ambiguity "is subject to the principle that a writing is construed against the author of the doubtful language." *Wright v. Commonwealth,*

---

4. Effective January 1, 1980, Massachusetts adopted extensive amendments to Article 9 of the Uniform Commercial Code. For the most part, the amendments reflected the adoption of the 1972 official version of the Code to update the version previously in effect in Massachusetts. The enactment used for the purposes of this proceeding is that which was in effect at the time of the relevant transactions. For example, the court notes the deletion of "contract rights" in section 9–102 pursuant to the 1980 enactment in Massachusetts. Although this deletion is perceived as of no substantive effect, the provision in force at the relevant time contained the category of "contract rights."

5. Section 9–103 governs conflict of laws. Section 9–104 provides:

*Transactions Excluded from Article.* This Article does not apply

(a) to a security interest subject to any statute of the United States such as the Ship Mortgage Act, 1920, to the extent that such statute governs the rights of parties to and third parties affected by transactions in particular types of property; or

(b) to a landlord's lien; or

(c) to a lien given by statute or other rule of law for services or materials except as provided in section 9–310 on priority of such liens; or

(d) to a transfer of a claim for wages, salary or other compensation of an employee; or

(e) to an equipment trust covering railway rolling stock; or

(f) to a sale of accounts, contract rights or chattel paper as part of a sale of the business out of which they arose, or an assignment of accounts, contract rights or chattel paper which is for the purpose of collection only, or a transfer of a contract right to an assignee who is also to do the performance under the contract; or

(g) to a transfer of an interest or claim in or under any policy of insurance; or

(h) to a right represented by a judgment; or

(i) to any right of set-off; or

(j) except to the extent that provision is made for fixtures in section 9–313, to the creation or transfer of an interest in or lien on real estate, including a lease or rents thereunder; or

(k) to a transfer in whole or in part of any of the following: any claim arising out of tort; any deposit, savings, passbook or like account maintained with a bank, savings and loan association, credit union or like organization.

M.G.L. c. 106, § 9–104.

The court notes that the reference to insurance in subsection (g) is inapplicable in the present case in that subsection (g) applies to rights under insurance policies only and does not extend to all insurance-related transactions. *See, U.C.C. 9–104, Official Comment 7.*

351 Mass. 666, 673, 223 N.E.2d 666, 670 (1967). *See, e. g. Ferber Co. v. Ondrick,* 310 F.2d 462, 465 (1st Cir. 1962); *New York Central R.R. v. Stoneman,* 233 Mass. 258, 262, 123 N.E. 679, 680 (1919). Furthermore, "[c]ontracts should be construed in accordance with justice and common sense and the probable intention of the parties." *Bowser v. Chalifour,* 334 Mass. 348, 352, 135 N.E.2d 643, 645 (1956). It would be vastly inequitable to allow St. Paul to have the exclusive right to all of the expirations of those policies placed with St. Paul regardless of how miniscule any default may be. This would be the result should the court adopt the interpretation of Paragraph 15 espoused by St. Paul.[6] Common sense dictates that the parties intended the subject clause to create a security interest. Inasmuch as Paragraph 15 contemplates a subsequent defeasance of the agent's ownership upon default, the provision presents a condition subsequent rather than a condition precedent as urged by St. Paul. Further, this condition subsequent is designed to secure the payment of an obligation, to wit, the payment of premiums by the agent. As such, Paragraph 15 fits squarely within the definition of "security interest" under M.G.L. c. 106, § 1–201(37), *supra*; *See Note,* 49 B.U.L.Rev. 286, 298 n. 47. This reading of Paragraph 15 is made even clearer by examination of subsections (a) and (b) of Paragraph 15.

a. Should a difference of opinion exist with respect to balances owed the Company by the Agent, the Agent shall immediately post collateral acceptable to the Company in the amount of such balances to be held by the Company until the differences are resolved.

b. Posting of collateral as provided shall retain for the Agent ownership of this Company's expirations.

Note that the only obligation in Paragraph 15, or anywhere else in the agreement for that matter, for the agent to account and pay over premiums within any designated time or suffer a forfeiture occurs "[in] the event of termination of this Agreement." The termination of the agency agreement in the present case occurred after the filing of the bankruptcy petition. Pursuant to the scheme of Paragraph 15, after termination of the agency agreement, the company at first recognizes the agent's exclusive right to the expirations which is then modified by the penalty for failure to account and pay promptly. Subsection 15(a) then recognizes the potential of dispute as to the balance due and the company agrees to accept a bond to assure payment and, according to subsection 15(b), as long as payment is protected by the security of a bond instead of the expirations, "[p]osting of collateral as provided shall *retain* for the Agent ownership of this Company's expirations." The agreement clearly spells out (". . . retain . . . ownership . . . .") ownership in the agent with forfeiture of the expirations being simply to assure and secure payment of premiums when the parties come to a parting of the ways.

The agent has a property interest in his clientele even prior to the placement of specific policies with specific companies (for as we have seen it is the agent who determines with which company to place a policy and the individual companies have no knowledge of the agent's clients prior to the agent supplying the company with such information), therefore query, does the characterization of when in Paragraph 15 the title shifts constitute more than an exercise in semantics? A grant of the agent's title to the expirations to the insurance company subject to a later release of that title to the agent upon performance would still constitute "an interest in personal property . . . which secures payment or performance of an obligation" and thus would still be a security interest within the ambit of the Uniform Commercial Code. Indeed, such a characterization would closely resemble a grant of a real estate mortgage in a title-theory state.[7] In Massachusetts, for exam-

---

6. *See* note 3 *supra.*

7. Of course, real estate mortgages are not covered by the Uniform Commercial Code and are

ple, legal title to the mortgaged property passes to the mortgagee upon execution of the mortgage. The passage of legal title in such a circumstance does not alter the nature of the transaction as one intended for purposes of security.

> While the legal estate or title to the mortgaged property passes to the mortgagee, the mortgagor, except as against the mortgagee, is still regarded as the real or general owner of the property until final foreclosure and sale. The conveyance or passing of such estate or title to the mortgagee is subject to the equitable principle, that it is only for the purpose of making the mortgaged property available or effective, as security, for the payment of the debt or the performance of some other collateral obligation, and is subject to defeasance on the performance of such a condition subsequent. (footnotes omitted)

Park, *Conveyancing, 28 Massachusetts Practice* § 351, at 393–94 (1968).

> Hence it is that, as between mortgagor and mortgagee, the mortgage is to be regarded as a conveyance in fee; because that construction best secures him in his remedy and his ultimate right to the estate, and to its incidents, the rents and profits. But in all other respects, until foreclosure, when the mortgagee becomes the absolute owner, the mortgage is deemed to be a lien or charge, subject to which the estate may be conveyed, attached, and in all other respects dealt with as the estate of the mortgagor.

*Ewer v. Hobbs*, 46 Mass. (5 Metc.) 1, 3 (1842), *quoted in* L. Jones, *1A Treatise on the Law of Mortgages of Real Property* § 35, at 37 (1915). *See also Charlestown Five Cents Savs. Bank v. White*, 30 F.Supp. 416, 418 (D.Mass.1939).

only being used as an analogy to illustrate the principle.

**8.** *See* note 5 *supra.*

**9.** Section 9–305, M.G.L. c. 106, § 9–305, provides in pertinent part:

Inasmuch as Paragraph 15 of the agency agreement constitutes a retention of a security interest on behalf of St. Paul, the applicability of Article 9 of the Uniform Commercial Code and the respective rights among St. Paul, the alleged secured parties, and the trustee remain to be determined. As noted previously, Article 9 applies to security interests in personal property as delineated in M.G.L. c. 106, § 9–102, unless the transaction is specifically excluded by section 9–104. An examination of section 9–104 establishes that the transaction presently before the court is not excluded by any provision in section 9–104.[8]

In order to determine the respective rights of the parties to this proceeding it is incumbent on the court to determine what type of property as defined in section 9–102 is represented by an interest in the expirations of an insurance agency. Although there is no dispute that St. Paul did not file or record any interest in the expirations involved herein, recording a security interest is not the exclusive method of perfecting a security interest under the Uniform Commercial Code, and although not raised by counsel, it may be well to consider the matter and manner of perfecting as it might apply here. Pursuant to M.G.L. c. 106, § 9–305, security interests "in letters of credit and advices of credit . . . ., goods, instruments, negotiable documents or chattel paper may be perfected by the secured party's taking possession of the collateral." Leaving aside the question of what constitutes possession of expirations for the moment, an examination of the Uniform Commercial Code's definitions of the above-mentioned types of property leads inevitably to the conclusion that section 9–305 is inapplicable in the present case and that insurance expirations are most properly categorized as "general intangibles" within the meaning of the Code.[9]

A security interest in letters of credit and advices of credit . . . ., goods, instruments, money, negotiable documents or chattel paper may be perfected by the security party's taking possession of the collateral.

The following definitions are provided by the Code:

Clearly, expirations fit into none of the categories enumerated in section 9–305. Of those categories of personal property to which Article 9 is applicable, as set forth in section 9–201, expirations most comfortably fit into the category of "general intangibles". Pursuant to section 9–106, "general intangibles" are defined as

any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments, and money. . . .

The term "general intangibles" was designed by the drafters of the Code as a catch-all category. The Official Comment to section 9–106 sheds further light on this category.

The term "general intangibles" brings under this Article miscellaneous types of contractual rights and other personal property which are used or may become customarily used as commercial security. Examples are goodwill, literary rights and rights to performance. Other examples are copyrights, trademarks and patents, except to the extent that they may be excluded by Section 9–104(a).

U.C.C. 9–106, Official Comment.

As the term "expirations" has been defined previously in this opinion, they actually constitute the "goodwill" of an insurance agency and as such are properly included under "general intangibles."

A security interest in general intangibles may not be perfected by possession.

One who reflects for a moment on the nature of the various kinds of collateral covered by Article Nine will appreciate that the pledge [perfection by possession] is uniquely suited to certain kinds of collateral and quite unsuited to other kinds. If the creditor's possession (and the debtor's lack of it) is to put third parties on notice, the collateral must be the type which one can see, touch and move. Also, the collateral must have a physical embodiment that can be recognized as exclusively representing the right. So it follows that contract rights, accounts, and general intangibles cannot be perfected by possession.

J. White & R. Summers, *Handbook of the Law under the Uniform Commercial Code* § 23–10, at 814 (1972). Expirations do not have "a physical embodiment that can be recognized as exclusively representing the right" inasmuch as both the agent and the insurance company have records containing the information that contributes the expirations. Indeed, as elucidated in *White v. Universal Underwriters Insurance Co.*, 347 Mass. 367, 372, 197 N.E.2d 868, 871 (1964),

letters of credit; advices of credit—5–103—
"Credit" or "letter of credit" means an engagement by a bank or other person made at the request of a customer and of a kind within the scope of this Article (Section 5–102) that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit.
goods—9–105—
"Goods" includes all things which are movable at the time the security interest attaches or which are fixtures (Section 9–313), but does not include money, documents, instruments, accounts, chattel paper, general intangibles, or minerals or the like, including oil and gas before extraction. "Goods" also includes standing timber which is to be cut and removed under a conveyance or contract for sale, the unborn young of animals, and growing crops;
instrument—9–105—
"Instrument" means a negotiable instrument (defined in Section 3–104), or a security (defined in Section 8–102) or any other writing which evidences a right to the payment of money and is not itself a security agreement or lease and is of a type which is in ordinary course of business transferred by delivery with any necessary indorsement or assignment;
money—1–201(24)—
"Money" means a medium of exchange authorized or adopted by a domestic or foreign government as part of its currency.
negotiable document—9–105—
"Document" means document of title as defined in the general definitions of Article 1 (Section 1–201), and a receipt of the kind described in subsection (2) of Section 7–201;
chattel paper—9–105—
"Chattel paper" means a writing or writings which evidence both a monetary obligation and a security interest in or a lease of specific goods, but a charter or other contract involving the use or hire of a vessel is not chattel paper. When a transaction is evidenced both by such a security agreement or a lease and by an instrument or a series of instruments, the group of writings taken together constitutes chattel paper;

the expiration is actually the exclusive right to the use of such information and is not necessarily the recordation of the information itself.

The Official Comment to section 9–305 clearly states the inapplicability of section 9–305 to general intangibles.

This section permits a security interest to be perfected by transfer of possession only when the collateral is goods, instruments, documents or chattel paper: that is to say, accounts and general intangibles are excluded . . . *A security interest in accounts and general intangibles —property not ordinarily represented by any writing whose delivery operates to transfer the claim—may under this Article be perfected only by filing* . . . .

*U.C.C. § 9–305, Official Comment 1* (emphasis added).

■ Insofar as St. Paul did not record its security interest and because filing is the required method of perfection under the Code in this instance,[10] the security interest of St. Paul is subordinate to the rights of the Kemper group, Agency Assistance Corp., and the trustee. Section 9–301 of the Uniform Commercial Code, M.G.L. c. 106, § 9–301, provides

(1) Except as otherwise provided in subsection (2), an unperfected security interest is subordinate to the rights of

.  .  .  .  .

(b) a person who becomes a lien creditor before the security interest is perfected;

M.G.L. c. 106, § 9–301(1)(b).

Section 9–301(3) of the Uniform Commercial Code defines "lien creditor" as

a creditor who has acquired a lien on the property involved by attachment, levy or the like and includes an assignee for benefit of creditors from the time of assignment, and a trustee in bankruptcy from the date of the filing of the petition .  .

M.G.L. c. 106, § 9–301(3).

Under the "strong arm" provision of section 544(a)(1) of the Bankruptcy Code the trustee is granted, as of the date of commencement of the bankruptcy case, the power to avoid transfers and obligations that may be voided by

a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained a judicial lien, whether or not such a creditor exists.

11 U.S.C. § 544(a)(1).

[T]he trustee in bankruptcy stands not only in the shoes of the bankrupt—he fits as well into the overshoes of the bankrupt's creditors.

*In re Leasing Consultants, Inc.,* 592 F.2d 103, 110 (2d Cir. 1979) (citing *Schneider v. O'Neal,* 243 F.2d 914, 918 (8th Cir. 1957)).

As between the security interest of St. Paul and the security interests of the Kemper group and Agency Assistance Corp., the St. Paul interest apparently would again be subordinate as both Agency Assistance Corp. and the Kemper group have presented at least prima facie evidence of perfection of their interests. As between the trustee and the Kemper group and Agency Assistance Corp., the court reserves the right to determine the validity of the Kemper and Agency Assistance security interests at a later date should the trustee allege grounds for objection to such interests. This reservation is occasioned only because of the trustee's late entry into this proceeding and is not intended as any intimation of any potential defect in Kemper's or Agency Assistance's security. The court notes that both the Kemper group and Agency Assistance Corp. have agreed to have the sale of the debtor's assets go forward with their security interests to attach to the proceeds so that a further determination of this issue is not immediately necessary.

It is therefore the finding of this court that St. Paul retained an unperfected secur-

---

**10.** Expirations, as a "general intangible" within the meaning of the Code, are not subject to any of the automatic perfection provisions of Article 9. *See* M.G.L. c. 106, § 9–302.

ity interest in the expirations belonging exclusively to the debtor insurance agency, which security interest is subordinate to both the rights of the trustee pursuant to section 544(a)(1) of the Bankruptcy Code and the rights of the Kemper group and Agency Assistance Corp. under their recorded security agreements as provided in section 9–301 of the Uniform Commercial Code. It is ordered that the sale of the exclusive right to use the expirations and goodwill of the debtor corporation go forward with the security interests of the Kemper group and Agency Assistance Corp. to attach to the proceeds of such sale, subject to a future determination of their rights by this court if so warranted.